726 S.E.2d 365

**William Edward TUMA**

v.

**COMMONWEALTH of Virginia.**

**Record No. 0919-10-2.**

Court of Appeals of Virginia,
Richmond.

June 12, 2012.

Kelsey, J., filed a dissenting opinion.

Beales, J., filed a dissenting opinion.

---

274

Linwood T. Wells, III, for appellant.

Craig W. Stallard, Assistant Attorney General (Kenneth T. Cuccinelli, II, Attorney General, on brief), for appellee.

Present: FELTON, C.J., ELDER, FRANK, HUMPHREYS, KELSEY, PETTY, BEALES, ALSTON, and HUFF, JJ.

## UPON A REHEARING EN BANC

HUMPHREYS, Judge.

A jury convicted William Edward Tuma ("Tuma") in the Circuit Court of Dinwiddie County ("trial court") of taking indecent liberties with a child, aggravated sexual battery, and animate object sexual penetration. On appeal, Tuma contends that the trial court erred by 1) ruling "on several occasions, during the jury trial and prior to sentencing, that the evidence discovered by [Tuma] during the jury trial, an audio tape, was

not exculpatory in nature, and therefore need not have been disclosed by the Commonwealth prior to trial, pursuant to *Brady v. Maryland*," 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and 2) "refusing to allow the jury to hear the audio tape and admit it into evidence." A panel majority of this Court reversed Tuma's convictions. We granted the Commonwealth's petition for rehearing *en banc* and stayed the mandate of the panel decision.

## I. Background

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" *Archer v. Commonwealth*, 26 Va.App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting *Martin v. Commonwealth*, 4 Va.App. 438, 443, 358 S.E.2d 415, 418 (1987)). So viewed, the facts establish the following.

In early February 2008, L.S., a five-year-old girl, told her stepmother and biological father that Tuma, her stepfather, had touched her inappropriately. A joint investigation by police investigators and the Dinwiddie County Department of Social Services (Dinwiddie DSS) ensued which led to Tuma's indictment on the three charges for which he was later convicted by a jury. Prior to trial, Tuma's counsel filed a motion for discovery which included a request for "[a]ny other information or evidence known to the Commonwealth which is or may be exculpatory."

At trial on January 12, 2009, L.S. testified that Tuma assaulted her when she lived in the "house next to horses." She specifically stated that Tuma touched her in her "bottom privates" and that it usually happened in Tuma's room after they watched movies that they should not have been watching because they included "[p]eople touching each other on their privates." L.S. testified that Debra Tuma, her mother, was also in the room when the movies were on, but that she would leave the room once the movies were finished. L.S. then stated that once Debra Tuma left the room, Tuma would tell her to take her clothes off and lie on the bed. L.S. stated that he would touch her only in her "down" private parts, that he

would put his fingers on and inside of her more than once, and that she could feel his fingers inside of her. L.S. could not recall how many times Tuma touched her when she lived in the house near the horses, but testified that it was "a lot." L.S. also testified that the sexual assaults sometimes took place in her bedroom. L.S. further testified that Tuma told her to touch her brother, who was three or four years old, when he was in the bathtub in "his down privates" while Tuma watched. At some point while the abuse was ongoing, Tuma, Debra, and L.S. moved from the house with the horses into an RV park. Prior to Christmas of 2007, L.S. went to live with her biological father and stepmother, but Debra Tuma still had visitation with L.S. The last time Tuma touched L.S. was around Christmas of 2007 in Tuma's bedroom when she was visiting her mother at the trailer.

On cross-examination, L.S. testified that she lived with her grandmother at one point and that Tuma also touched her there, but she could not remember the number of times it occurred. L.S. also replied on cross-examination that Tuma touched her more than ten times in the house with horses. L.S. further stated that Tuma touched her about three times a week at the "RV park."

When she lived with her biological father, L.S. inappropriately touched her male nephew. It was after the incident with her nephew that L.S. told her stepmother and biological father what Tuma had been doing to her and what he made her do to her brother.

Ms. Jon Scheid of Dinwiddie DSS and Sheriff's Department Investigator Dwayne Gilliam interviewed L.S. regarding L.S.'s allegations against Tuma. Investigator Gilliam testified at trial that L.S. reported during the interview that Tuma had "been touching her inappropriately for a period of time" and that the abuse occurred at two locations, one of which was Green Acres Trailer Park. An investigation was initiated based on this report, and the alleged assaults were determined to have occurred in Dinwiddie at 9617 Boydton Plank Road (L.S. refers to this location in her statement and testimony as "the

house with the horses"), and 7901 Lot 36 Boydton Plank Road at Green Acres Trailer Park. Tuma was then arrested and charged with animate object penetration, aggravated sexual battery, and indecent liberties with a minor. On cross-examination, Investigator Gilliam testified that he believed the interview with L.S., Ms. Scheid, and himself may have been recorded on an audio tape, but he did not know if a transcript was ever made from the tape.

Ms. Scheid testified at trial that she had recorded the interview with L.S. and Investigator Gilliam and she had the audio tape in her possession; she stated that the recording was about thirty to forty minutes in length.[1] Ms. Scheid further testified that L.S. stated in the interview that the sexual abuse occurred at two locations, with the majority of incidents occurring at the house with the horses and one incident occurring at a residence in Green Acres Trailer Park. Ms. Scheid also stated that the tape included L.S.'s reference to the one incident at the trailer park. Upon discovering that Ms. Scheid had the tape in her possession, Tuma's counsel asked the trial court to play the audio tape. The Commonwealth objected, and the following colloquy took place:

THE COURT: Have you heard it?

[TUMA'S COUNSEL]: No, sir.

THE COURT: I am not going to play it. You can go listen to it if you want on your own time. We are not going to just—I don't know what is there. We don't know what is in there. We will not just play a tape. You have already asked her about what was said.

[TUMA'S COUNSEL]: Well, the argument is that it is the best evidence in the case in terms of what the child said on that audio tape.

---

1. The Virginia Administrative Code requires that most such interviews be recorded. 22 VAC 40–705–80(B)(1) provides in pertinent part: "The child protective services worker shall conduct a face-to-face interview with and observation of the alleged victim child and siblings. All interviews with alleged victim children must be electronically recorded [except in certain circumstances, none of which are applicable here]."

THE COURT: I don't think it is the best evidence in the case. It might be some evidence. You can take it off and listen to it. Has this been denied to [Tuma's counsel], this tape?

[COMMONWEALTH'S ATTORNEY]: No, sir.

THE COURT: He had access to it?

[COMMONWEALTH'S ATTORNEY]: He can listen to it if he wants to.

THE COURT: We'll not play it now because you want to play it. It is not admissible unless it contradicts something that she has said. You haven't heard it. So we'll not just play a tape and run this thing sort of offbeat, off horse back without any sort of thought or notion as to what is there. It is not going to be played....

After reporting the sexual assaults, L.S. began seeing Amy Holloman, a counselor. Ms. Holloman testified at trial, and was qualified as an expert on adolescent trauma. She testified that it is uncommon for a child victim of this type of trauma to report the abuse right after it occurs. She also opined that it was uncommon for children to be able to remember specific dates and instances because "[t]hey try to repress as much as possible." However, she stated that it is very common in therapeutic situations for more information to come out once the child has established a trusting relationship with the counselor, which is what occurred with her and L.S. Ms. Holloman then testified that she personally observed the following behavior in L.S.: "pacing in my office, avoiding eye contact, avoiding the subject matter, leaving my office." According to Ms. Holloman, these specific behaviors coupled with the actual reporting of the incident are consistent with claims of sex abuse.

At the conclusion of the Commonwealth's case, Tuma's counsel moved to strike the evidence on the basis that the audio tape is the best evidence and that it is exculpatory. The following exchange then took place:

THE COURT: Have you listened to the tape?

[COMMONWEALTH'S ATTORNEY]: No, sir.

THE COURT: So you don't know whether it is exculpatory or not?

[COMMONWEALTH'S ATTORNEY]: No, sir.

THE COURT: So therefore you didn't give it to him as being exculpatory because you never listened to it? You don't think it is—he is entitled to it because it is not exculpatory? You just don't know?

[COMMONWEALTH'S ATTORNEY]: I relied on my investigator who had given me his notes and transformed that into a typewritten statement that codified what went on at that particular interview.

THE COURT: So you are satisfied there is nothing significant or exculpatory? Are you willing to stand on that? If it is you will not have complied with Brady.

[COMMONWEALTH'S ATTORNEY]: Yes, sir.

THE COURT: You are willing to let that go?

[COMMONWEALTH'S ATTORNEY]: Yes, sir.

THE COURT: You don't know what is on there either?

[COMMONWEALTH'S ATTORNEY]: Yes, sir.

THE COURT: We have heard from two witnesses as to what was done, Mrs. Scheid and Mr. Gilliam both of them were cross examined. This is just a tape of what they heard, correct?

You are saying that you think it is exculpatory?

[TUMA'S COUNSEL]: Yes, sir.

THE COURT: In some way?

[TUMA'S COUNSEL]: Yes, I mean I can't get the material. I have asked the representatives.

THE COURT: Well, I don't think you are entitled just to play something because you think it may be exculpatory or there may be something in there as slightly inconsistent three or four times they don't remember you had ham and eggs for breakfast one morning and another time you say sausage and eggs. I just don't think it is admissible, [Tuma's counsel]. The Court is not going to admit it. If at some point if your client is convicted that

tape shows something that is significant, exculpatory, he gets a new trial. So that is the way we are going with it. We will just not play a tape I don't know if it is 15 minutes or two hours about a conversation we have heard two people testify to.

[TUMA'S COUNSEL]: Actually we have heard from three people about that conversation. We have heard from the victim herself, the conversation. We have heard from Mrs. Scheid, and we have heard from the investigator.

On January 12, 2009, the jury returned a verdict of guilty on all three charges. On February 19, 2009, after the jury verdict but prior to entry of the conviction or sentencing orders, Tuma's counsel filed a subpoena *duces tecum* to obtain the audio tape from Dinwiddie DSS. On February 27, 2009, Tuma's counsel filed a motion to compel the Commonwealth to deliver a copy of the audio tape to him. The Commonwealth's Attorney did not respond to Tuma's motion, but on or around March 7, 2009, Dinwiddie DSS filed a response to Tuma's motion to compel and subpoena *duces tecum* and stated that neither the Commonwealth's Attorney nor Tuma's counsel were entitled to the tape, because it was produced as a result of a social services investigation. On March 9, 2009, the trial court entered the conviction order confirming the jury's verdict. The proof of service for the subpoena *duces tecum* on Ms. Scheid of Dinwiddie DSS was returned on March 11, 2009, marked "too late for service." On April 17, 2009, Tuma's counsel filed a motion to preserve the tape recording with the trial court. The motion noted a hearing scheduled for April 30, 2009 on Tuma's motion to compel. At the hearing on April 30, 2009, the trial court ordered the attorney for Dinwiddie DSS to listen to the tape, remove any extraneous confidential information, and give the remainder to Tuma's counsel.

The transcript of the audio tape reflects that L.S. told Investigator Gilliam that the abuse occurred at the white house with the horses. L.S. initially did not remember how many times Tuma touched her, but Investigator Gilliam, upon more questioning, narrowed it down to "between five and ten times" while at the white house. Investigator Gilliam asked:

"When he touched you um it would always be at the white house?" L.S. replied: "Yes." When asked if the abuse happened at any other house, L.S. replied that it did not. Ms. Scheid then asked more specifically if Tuma ever touched L.S. at Green Acres in the trailer or at Grandma's house. L.S. again replied "No" to both questions. When Ms. Scheid asked, "So everything you are telling me everything happened at the white house?" L.S. replied, "Yes." In fact, L.S. indicated five times throughout the interview that the touching occurred at the white house. When asked, "What part of the house would this happen in? Do you remember?" L.S. replied, "um yes in his room." L.S. never mentioned abuse occurring in her bedroom during the interview.

As part of his report, Investigator Gilliam summarized the interview of L.S. This summary was all that was provided to Tuma's counsel pursuant to his discovery requests, and Tuma's counsel used it to cross-examine Investigator Gilliam at trial. The summary stated, in part, "[L.S.] was asked when Billy touched her, she replied during visitation with her mother Debra." This question and answer is not found in the transcript of L.S.'s taped interview. The summary also reads: "[L.S.] was asked when was the last time Billy touched her, she replied at Nikki's house in December 07, Christmas holiday visitation." This statement also is not found in the interview transcript. The summary fails to convey L.S.'s difficulty remembering how many times Tuma touched her in the white house: in the interview transcript L.S. stated "I don't remember," before Investigator Gilliam, through questioning, helped her narrow it down to "between five and ten times." Most notably, the summary does not include L.S.'s three separate negative responses to the questions of (1) whether the touching occurred at any house other than the white house, (2) "[d]id anything ever happen at Grandma's house?", and (3) "has he ever touched you at Green Acres in the trailer?"

After listening to the tape, Tuma filed a motion to set aside the jury verdict based on exculpatory evidence discovered post-trial and a motion to strike the evidence as not sufficient

to convict. On January 4, 2010, the trial court held a hearing on the motions, subsequently reviewed the trial transcripts, the audio tape of the interview, and the transcript of the audio taped interview. On January 29, 2010, the trial court entered an order denying the motions and entered the Commonwealth's drafted findings of fact and conclusions of law. On April 16, 2010, Tuma filed an objection to the trial court's finding of fact, conclusions of law, and January 29, 2010 order. On April 22, 2010, the trial court entered the sentencing order, which imposed the sentencing verdict of the jury, a sentence of thirty-five years. This appeal followed.

## II. Analysis

### A. The Failure to Disclose Exculpatory Evidence

#### 1. The Special Responsibilities of a Prosecutor

The role of public prosecutor, an attorney who represents the interests of the sovereign in criminal cases, has evolved in parallel with that of the Common Law of England and traces its pedigree back more than 750 years. Lawrence del Brok in 1243 is considered the first professional attorney to prosecute pleas on behalf of the Crown. J. Ll. J. Edwards, *The Law Officers of the Crown* 15 (Sweet & Maxwell) (1964).

In America, the earliest example of a public prosecutor is in the colony of Connecticut in 1704.

> [H]enceforth there shall be in every countie a sober, discreet and religious person appointed by the Countie Courts, to be Attorney for the Queen, to prosecute and implead in the lawe all criminall offenders, and to doe all other things necessary or convenient as an attorney to suppresse vice and imorallitie.

Charles J. Hoadly, *The Public Records Of The Colony Of Connecticut: From August, 1689, To May, 1706* 468 (Press of Case, Lockwood and Brainard) (1868); *see also* Jack M. Kress, *Progress and Prosecution, in Annals of the American Academy of Political and Social Sciences 423* 99, 103 (1976) ("In May of 1704, the Connecticut Assembly passed the law which

is generally recognized as creating the first permanent office of public prosecutor on a colony-wide basis...").

Early American case law also reflects the necessity that those who represent the government and its citizens be fair and honorable.

> He is to judge between the people and the government; he is to be the safeguard of the one and the advocate for the rights of the other; he ought not to suffer the innocent to be oppressed or vexatiously harassed, any more than those who deserve prosecution to escape; he is to pursue guilt; he is to protect innocence; he is to judge the circumstances, and according to their true complexion, to combine the public welfare and the safety of the citizens, preserving both, and not impairing either. He is to decline the use of individual passions, and individual malevolence, when he cannot use them for the advantage of the public; he is to lay hold of them where public justice, in sound discretion, requires it.

*Foute v. State,* 4 Tenn. 98, 99 (1816).

> The [prosecutor] is a quasi-judicial officer. He represents the commonwealth, and the commonwealth demands no victims. It seeks justice only, equal and impartial justice, and it is as much the duty of the [prosecutor] to see that no innocent man suffers, as it is to see that no guilty man escapes. Hence, he should act impartially. He should present the commonwealth's case fairly, and should not press upon the jury any deductions from the evidence that are not strictly legitimate.

*Appeal of Nicely,* 130 Pa. 261, 18 A. 737, 738 (1889).

The higher standard of professionalism and duty applicable to those who represent the interests of the public and their government was succinctly restated in 1935 by Justice Sutherland, and his words are often quoted:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that

justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

Our Anglo–American system of justice presumes innocence in criminal cases and places a high burden on the attorney for the Commonwealth to overcome that presumption. However, other attorneys have no such obligation nor should they.

Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime. To this extent, our so-called adversary system is not adversary at all; nor should it be. But defense counsel has no comparable obligation to ascertain or present the truth. Our system assigns him a different mission. He must be and is interested in preventing the conviction of the innocent, but, absent a voluntary plea of guilty, we must also insist that he defend his client whether he is innocent or guilty. The State has the obligation to present the evidence. Defense counsel need present nothing, even if he knows what the truth is. He need not furnish any witnesses to the police, or reveal any confidences of his client, or furnish any other information to help the prosecutor's case. If he can confuse a witness, even a truthful one, or make him appear at a disadvantage, unsure or indecisive, that will be his normal course. Our interest in not convicting the innocent permits counsel to put the State to its proof, to put the State's case in the worst possible light, regardless of what he thinks or knows to be the truth.

*United States v. Wade,* 388 U.S. 218, 256–58, 87 S.Ct. 1926, 1947–48, 18 L.Ed.2d 1149 (1967) (White, J., concurring and dissenting).

The asymmetry of the criminal justice system certainly places onerous demands on prosecutors. Defense attorneys may pursue acquittals notwithstanding all evidence to the contrary. While this provides fertile ground for many lawyer jokes, such zealous advocacy, despite any apparent hopelessness of the effort, is an essential ingredient to a fair trial and buttresses the foundation of our system of justice. Prosecutors may be understandably frustrated by the notion of unequal combat and with trials structured as zero-sum competitions featuring a clear winner and loser, they may be tempted to resist allowing their opponent any tactical advantage. However, the higher obligation to fairness and justice required of prosecutors is as integral to the effective operation of our system of justice as the duty of zealous representation of the defendant is for their courtroom opponents. Prosecutors must never forget that they are public servants whose oath requires them to serve their clients though a commitment to the fair, impartial, and objective administration of justice rather than the single-minded pursuit of victory, and they ignore that difference at their peril.

### 2. The Prosecutor's Duty with Respect to Exculpatory Evidence

Tuma argues that the audio tape made by Dinwiddie DSS of L.S.'s interview where she complained of sexual abuse "contained exculpatory evidence and should have been disclosed to defense counsel prior to trial." He contends that had the Commonwealth provided the tape to him, he could have used it to impeach the credibility of L.S., Ms. Scheid, Investigator Gilliam, and the counselor, Amy Holloman, and "the investigation against the defendant as a whole at trial." [2]

---

**2.** As discussed more fully below, we conclude that the evidence at issue is material and exculpatory because of its impeachment value with regard to L.S.'s testimony as well as with respect to the testimony of

The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20th century strictures against the use of perjured testimony and is most prominently associated with the decision by the Supreme Court of the United States in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* held "that the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–97; *see also Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2575, 33 L.Ed.2d 706 (1972).

However, "[w]hen an exculpatory evidence claim is reviewed 'on appeal, the burden is on [the] appellant to show that the trial court erred.'" *Gagelonia v. Commonwealth,* 52 Va.App. 99, 112, 661 S.E.2d 502, 509 (2008) (quoting *Galbraith v. Commonwealth,* 18 Va.App. 734, 739, 446 S.E.2d 633, 637 (1994)). A "'constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.'" *Teleguz v. Commonwealth,* 273 Va. 458, 488, 643 S.E.2d 708, 727 (2007) (quoting *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985)). "In determining the question of materiality, we consider the suppressed evidence as a whole, not item by item and if a *Brady* violation is established, we do not engage in a harmless error review." *Id.*[3]

---

Investigator Gilliam and Ms. Scheid, whose testimony was based in part on L.S.'s interview statements. However, we find that the audio tape of L.S.'s interview with Investigator Gilliam and Ms. Scheid has no impeachment value with respect to Ms. Holloman's trial testimony, as her testimony only related to her opinion based on her expertise and L.S.'s statements made and behavior exhibited during counseling sessions. She did not testify to or comment on L.S.'s interview with Ms. Scheid and Investigator Gilliam.

**3.** Judge Beales' dissent ignores this approach as well as the definition of *Brady* materiality as recited in *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Instead, Judge Beales parses L.S.'s testimony item by item, concludes that he would have

 The suppression by the prosecution of evidence favorable to the defendant "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been

---

found the discrepancies regarding the quantum and location of her assaults insignificant and then performs exactly the sort of harmless error analysis found inappropriate in *Bagley*. His methodology fails to heed the Supreme Court's admonition that

> *Kyles* instructed that the materiality standard for *Brady* claims is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." [*Kyles*,] 514 U.S. at 435, 115 S.Ct. at 1566; *see also id.* at 434–35, 115 S.Ct. at 1566 ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.").

*Banks v. Dretke*, 540 U.S. 668, 698–99, 124 S.Ct. 1256, 1271, 157 L.Ed.2d 1166 (2004).

His dissent also displays a lack of appreciation for the basic concept that inconsistent statements that conflict on the details of alleged criminal acts are by definition material, not because they must affirmatively demonstrate innocence as suggested by Judge Beales, but rather they are material because the inconsistencies with regard to the facts surrounding the offense may be reasonably considered by the factfinder on the question of the witnesses' credibility and the weight to be given their testimony. Those tasked with assigning credibility to the witnesses are not appellate judges reviewing a bare transcript; they are the citizens sitting on the jury. Their credibility assessments take into account not only the words uttered by the witnesses, but also the manner in which they spoke them along with any non-verbal mannerisms that were observable but which no record can adequately document. Thus, the jury should have been permitted to include any inconsistencies from prior statements that related to any details of the alleged offenses in their overall credibility analysis and weigh them accordingly. In the context presented by this record, the *Brady* issue is whether the inability to cross-examine the witnesses in front of the factfinder with respect to inconsistencies between their trial testimony and an earlier interview regarding details of the criminal acts undermines confidence that a fair trial was had. While a properly conducted new trial may well achieve the same result, the point we must decide today is whether the totality of the record in this case supports a high degree of confidence that the trial conducted in this case, was fair. For the reasons discussed more fully below, we reach the conclusion that it was not.

suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell,* 556 U.S. 449, 469–70, 129 S.Ct. 1769, 1783, 173 L.Ed.2d 701 (2009). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'" *Smith v. Cain,* —— U.S. ——, ——, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012) (quoting *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995)).

> While the definition of *Bagley* materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation, ... the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles,* 514 U.S at 437–38, 115 S.Ct. at 1567–68.

Indeed, as Justice Souter went on to observe in *Kyles,* "'The prudent prosecutor will resolve doubtful questions in favor of disclosure.'" *Id.* at 439, 115 S.Ct. at 1568 (quoting *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 2399–

2400, 49 L.Ed.2d 342 (1976)). "This is as it should be. Such disclosure will serve to justify trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.' " *Id.* (quoting *Berger*, 295 U.S. at 88, 55 S.Ct. at 633).

■ Nevertheless, for evidence to be exculpatory, it must necessarily be material with respect to innocence or the degree of guilt with regard to lesser offenses, the degree of punishment that would be appropriate, or the impeachment of the credibility of a witness with regard to material facts. In *Smith*, the United States Supreme Court recently held that the undisclosed statements of an eyewitness were "plainly material" where the eyewitness' testimony was the *only* evidence linking the defendant to the crime. —— U.S. at ——, 132 S.Ct. at 630. At trial, the eyewitness identified Smith as the "first gunman to come through the door" and stated that he had been "face to face with Smith" during the robbery. *Id.* "No other witnesses and no physical evidence implicated Smith in the crime." *Id.* at ——, 132 S.Ct. at 629. After his conviction, Smith found previously undisclosed notes of the lead investigator of the murder. *Id.* The investigator wrote on the night of the murder that the eyewitness could not supply a description of the perpetrators. *Id.* In notes taken five days after the crime, the investigator recorded that the eyewitness said he could not see faces and would not know the perpetrators if he saw them. *Id.* at ——, 132 S.Ct. at 629–30. The investigator's typewritten report of his conversation with the eyewitness five days after the crime states that the eyewitness " 'could not identify any of the perpetrators of the murder.' " *Id.* at ——, 132 S.Ct. at 630. The Court observed that "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Id.* However, such was not the case where the eyewitness' testimony was the only evidence linking the defendant to the crime, and his undisclosed statements directly contradicted his trial testimony. *Id.* While "the jury *could*

have disbelieved [the eyewitness'] undisclosed statements," the Court had "no confidence that it *would* have done so." *Id.*

██ *Smith* controls our analysis here. Just as in *Smith*, L.S.'s testimony is the only evidence linking Tuma to the crimes in this case, and there is no physical evidence implicating Tuma. As the Commonwealth's entire case depended on L.S.'s account of Tuma's sexual abuse of her, L.S.'s undisclosed interview responses, where they materially varied from her trial testimony, constituted impeachment evidence material to Tuma's guilt or punishment.[4]

██ On cross-examination at trial, L.S. testified that Tuma touched her at her grandmother's house and about three times a week at the RV park. However, during the interview, L.S. replied that Tuma did not touch her at her grandmother's house and he did not touch her at the trailer park.[5] Investigator Gilliam asked during the interview, "When he touched you um [sic] it would always be at the white house?" L.S. replied, "Yes." Ms. Scheid asked, "So everything you are telling me everything happened at the white house?" L.S. replied, "Yes." L.S. affirmed five times during the interview that the touching occurred at the white house, which is the "house near the horses."

Further, at trial L.S. testified that the sexual assaults sometimes took place in her bedroom, but during the interview L.S. only stated that the assaults occurred in Tuma's room.

As for the number of times Tuma assaulted L.S., on direct examination at trial, L.S. could not recall how many times Tuma touched her when she lived in the house near the

---

4. In *Bagley*, the United States Supreme Court "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes." *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1565. *See also Robinson v. Commonwealth*, 231 Va. 142, 150, 341 S.E.2d 159, 164 (1986) (impeachment value alone makes information exculpatory).

5. The exculpatory nature of this discrepancy in the locations where the alleged abuse occurred was compounded by the Commonwealth's response to Tuma's motion for a bill of particulars advising that L.S. had been sexually abused at both locations.

horses, but testified that it was "a lot." On cross-examination, L.S. stated that Tuma touched her more than ten times at the house next to the horses. During the interview, L.S. could not remember how many times Tuma touched her at the house next to the horses; but after questioning, Investigator Gilliam narrowed her response to "between five and ten times."

The evidence contained in the undisclosed audio tape could have been used by Tuma for impeachment purposes to challenge the credibility of L.S., his accuser, and the only eyewitness against him. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' evidence affecting the credibility of that witness should not be concealed by the prosecution." *Burrows v. Commonwealth,* 17 Va.App. 469, 472, 438 S.E.2d 300, 303 (1993) (quoting *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). In order to convict Tuma, the jury in this case had to believe L.S.'s testimony. Thus, Tuma's guilt or innocence depended entirely on L.S.'s reliability as a witness and any evidence affecting her credibility should have been revealed by the Commonwealth. However, it is important to note that the prosecutor's duty to disclose exculpatory evidence under *Brady* is not congruent with any obligation to disclose information under the rules and statutes regarding discovery, and the constitutional duty is triggered only when the information in the prosecutor's control becomes exculpatory. Thus, had L.S. testified consistently in the interview with Investigator Gilliam and Ms. Scheid, any pre-trial interviews with the prosecutor, and at trial, the audio tape would not have been exculpatory evidence, and there would have been no constitutional obligation on the part of the prosecutor to disclose it. *See Taylor v. Commonwealth,* 41 Va.App. 429, 436, 585 S.E.2d 839, 843 (2003) (the Commonwealth is not required to provide a defendant with investigative notes of witness statements unless the notes contain witness statements that are inconsistent or contradictory to that witness' or another witness' material testimony and could have been used to impeach the declarant or another witness). However, once L.S.'s interview statements proved inconsistent with her later account of the sexual

assaults, whether when interviewed by the prosecutor before trial [6] or, at the latest, at trial immediately following her inconsistent direct testimony, the audio tape of the interview became evidence material to Tuma's guilt and/or punishment and should have been immediately disclosed when the discrepancy became known or should have become known to the prosecutor.[7] For the same reason, the audio tape also became exculpatory when Investigator Gilliam and Ms. Scheid testified to statements made by L.S. to them that were materially different from those reflected in the audio tape of their interview.[8]

---

6. Constitutional error may occur when the prosecution fails to assist the defense by disclosing information that might have been helpful in conducting the cross-examination. *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381. "[S]uch suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial." *Id.*

7. That the prosecutor gave Tuma's counsel Investigator Gilliam's one-page written summary of L.S.'s "30 to 40 minute" interview prior to trial and relied upon it herself did not satisfy her responsibility under *Brady*. A single-page summary of such a lengthy interview, must necessarily have been incomplete and indeed, among other discrepancies with the transcript, the written summary does not include L.S.'s interview responses that nothing ever happened at Grandma's house, that Tuma never touched her at the Green Acres trailer, and that everything happened at the white house.

 > While *Brady* does not embrace a "best evidence" rule prohibiting the use of summaries, such summaries of exculpatory evidence must be complete and accurate.... An incomplete or inaccurate summary could be constitutionally insufficient under *Brady* when the omissions or inaccuracies resulted in the prejudicial suppression of material evidence favorable to the defendant.

 *Garnett v. Commonwealth*, 275 Va. 397, 409, 657 S.E.2d 100, 108 (2008).

 This case aptly illustrates the inherent risk, noted by our Supreme Court in *Garnett*, which a prosecutor takes on when only providing a "summary" of an interview in lieu of a verbatim recording or transcript. The written summary in this case does not include L.S.'s statements about where the abuse *did not* occur. The written summary also contained statements purportedly from L.S. that were not found in the transcript of the interview, without any explanation as to the discrepancy. Thus, the written summary was significantly incomplete.

8. Ms. Scheid's trial testimony that L.S. reported abuse at Green Acres Trailer Park in the interview is not supported by the interview transcript. As previously noted, L.S. specifically stated in the interview, "it

We note that the record in this case reflects that the Commonwealth's Attorney never listened to the audio tape of L.S.'s statements to Investigator Gilliam and Ms. Scheid to determine whether it conflicted in any material way with her pre-trial interviews with L.S., Ms. Scheid, or Investigator Gilliam, or their trial testimony. Moreover, when asked by the trial court, "Has this been denied to [Tuma's counsel], this tape?", the Commonwealth's Attorney responded, "No." In fact and despite this response and her later statement to the trial court that counsel for Tuma "could listen to it if he wants to," the prosecutor nevertheless failed to produce the tape or assist Tuma in obtaining it from Dinwiddie DSS when they refused to produce it upon Tuma's subsequent request. We also note that Dinwiddie DSS took the position that it would not disclose the contents of the audio tape to either the prosecutor or counsel for Tuma.

The law provides no support for the position taken by Dinwiddie DSS. To the contrary, the law is clear that the prosecutor is charged with the clear and affirmative duty of disclosing all exculpatory evidence in the possession, custody, or control of the Commonwealth and its agents. Any claim of Dinwiddie DSS that the audio tape was privileged information

---

wasn't when we were living in the trailer ...," and further that the abuse did not occur at any other house than the white house. Thus, although Ms. Scheid testified at trial that the audio tape contained L.S. stating that the abuse occurred in the trailer, the record establishes that the tape did not contain such information. Therefore, Tuma's counsel could have used the audio tape to impeach Ms. Scheid's testimony stating that L.S.'s allegation regarding the Green Acres Trailer Park was on the audio tape.

Tuma also alleges that he could have used the audio tape to impeach Investigator Gilliam's testimony that L.S. mentioned the abuse at the Green Acres Trailer Park in the interview. As previously mentioned, L.S. specifically stated in the interview, "it wasn't when we were living in the trailer ...," and further that the abuse did not occur at any other house than the white house. Thus, although Investigator Gilliam testified at trial that L.S. had mentioned the trailer in the interview, the record establishes that the audio tape did not contain such information. Therefore, Tuma's counsel could have used the audio tape to impeach Investigator Gilliam's testimony that L.S. reported in the interview that Tuma abused her at the trailer.

to DSS is easily dispensed with in light of this Court's well-settled precedent establishing otherwise. In *Ramirez v. Commonwealth,* 20 Va.App. 292, 296, 456 S.E.2d 531, 533 (1995), this Court held that employees of a local department of social services who were "involved in the investigation of the child abuse allegation were agents of the Commonwealth for purposes of Rule 3A:11(b)(2)." Specifically, this Court stated that, "where an agency is involved in the investigation or prosecution of a particular criminal case, agency employees become agents of the Commonwealth for purposes of Rule 3A:11 and must be considered a party to the action for purposes of Rule 3A:12." *Id.* at 296–97, 456 S.E.2d at 533. " 'The Commonwealth is charged with the responsibility to interview all government personnel involved in a case in order to comply with its discovery obligations.' " *Knight v. Commonwealth,* 18 Va.App. 207, 214, 443 S.E.2d 165, 169 (1994) (quoting *Harrison v. Commonwealth,* 12 Va.App. 581, 585, 405 S.E.2d 854, 857 (1991)). It is axiomatic that if personnel of a department of social services are agents of the Commonwealth for the purposes of discovery under Rule 3A:11, they are certainly such for the purpose of providing constitutional due process for a criminal defendant. By participating in a criminal investigation, Dinwiddie DSS was "acting on the government's behalf," *Kyles,* 514 U.S. at 437, 115 S.Ct. at 1567, and became an agent of the prosecutor for the purpose of *Brady* and its progeny, and it certainly had no authority to withhold evidence from either the prosecutor or Tuma that due process principles required be disclosed. Moreover, the Code of Virginia specifies that when a department of social services participates in a criminal investigation, it is the law enforcement agency and the prosecutor who determine what information to release to third parties and not the department.[9] The prose-

---

9. Code § 63.2–1516.1 provides that

[i]n all cases in which an alleged act of child abuse or neglect is also being criminally investigated by a law-enforcement agency, and the local department is conducting a joint investigation with a law-enforcement officer in regard to such an alleged act, no information in the possession of the local department from such joint investiga-

cutor in this case had a clear, unequivocal, and ongoing constitutional duty to learn of any favorable evidence known to Dinwiddie DSS, an agent acting on behalf of the Commonwealth, and to take active steps to disclose any that existed to Tuma. Therefore, beyond her initial duty to inquire about potentially exculpatory evidence in the possession of Dinwiddie DSS, once the prosecutor became aware of the existence of the tape, she had an affirmative responsibility to ensure that if its contents were or later became exculpatory, she disclose and produce it to the defense with sufficient timeliness that it could be used for possible impeachment.

The Commonwealth argues on brief that "even if" any of L.S.'s post-interview statements contradicted her interview responses, any impeachment value would be minimal considering Ms. Holloman's expert testimony that children attempt to repress events of abuse. However, the "jury determines the weight of the evidence and the credibility of the witnesses," *Bloom v. Commonwealth*, 262 Va. 814, 821, 554 S.E.2d 84, 87 (2001), and resolution of factual questions is "wholly within the province of the jury," *Keener v. Commonwealth*, 8 Va.App. 208, 214, 380 S.E.2d 21, 25 (1989). The jury is not required to accept the testimony of an expert witness; rather the " 'jury has a right to weigh the testimony of all the witnesses, experts and otherwise.' " *Walrod v. Matthews*, 210 Va. 382, 390, 171 S.E.2d 180, 186 (1969) (quoting *Pepsi–Cola Bottling Co. of Norfolk v. McCullers*, 189 Va. 89, 99, 52 S.E.2d 257, 261 (1949)).

The Commonwealth asserts that in the context of the entire record, any impeachment value the audio tape would have provided does not undermine confidence in the jury's determination of Tuma's *guilt*. The Commonwealth's argument is essentially that, if the audio tape had been disclosed in a

---

tion shall be released by the local department except as authorized by the investigating law-enforcement officer or his supervisor or the local attorney for the Commonwealth.

*See also* Code § 63.2–105(A) ("Persons having a legitimate interest in child-protective services records of local departments include . . . attorneys for the Commonwealth.").

timely fashion, the jury *could* nevertheless have found L.S. credible and convicted Tuma, but given that the Commonwealth's case rested entirely on her testimony and applying the Supreme Court's holding in *Smith,* we have no confidence that it necessarily *would* have done so. Moreover, even if we agreed with the Commonwealth, our analysis regarding a *Brady* violation would not end there. A *Brady* violation occurs when the prosecution suppresses evidence favorable to the defendant that is material *either* to guilt *or to punishment. Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97. In *Cone,* the United States Supreme Court found that the trial court should have considered the materiality of the evidence with respect to punishment in determining whether the suppressed evidence was material within the meaning of *Brady. Cone,* 556 U.S. at 472, 129 S.Ct. at 1784. The Court concluded that because "the evidence suppressed at Cone's trial may well have been material to the jury's assessment of the proper punishment in [the] case, . . . a full review of the suppressed evidence and its effect is warranted." *Id.* at 475, 129 S.Ct. at 1786.

In criminal cases in Virginia, "the power to determine punishment of one convicted of a criminal offense rests in the jury. . . . The jury's role has long been construed to be more than advisory, resulting in more than just a recommendation of punishment." *Frye v. Commonwealth,* 231 Va. 370, 397, 345 S.E.2d 267, 286 (1986). *See* Code § 19.2–295 (In a case tried by a jury, the jury shall ascertain the term of confinement and the amount of fine, if any, of a person convicted of a criminal offense).

That the impeachment evidence in the tape could have affected the credibility of L.S. in the eyes of the jury goes not only to the confidence in the outcome of the trial concerning Tuma's guilt or innocence, but also to the confidence in the sentence fixed by the jury. Had the jury known of L.S.'s recorded interview statements, that the abuse occurred only at the white house between five and ten times and not at the trailer or her grandmother's house, the jury very well could have doubted the number of times Tuma sexually abused L.S., considering that her interview statements contradicted her

▮▮▮

trial testimony. It is reasonable to conclude that the evidence of repeated occurrences of the sexual abuse at three separate locations impacted the jury's assessment of a proper punishment for Tuma. The evidence in the interview would have been favorable to Tuma as it could have been used to impeach the credibility of L.S.'s testimony on the number of times and different locations where Tuma sexually abused her. Therefore, the evidence was also material to Tuma's degree of punishment, and suppression of the recorded interview constituted a separate *Brady* violation on that basis.

▮▮▮ We now turn to the ongoing nature of the prosecutor's burden to comply with the requirements of *Brady* in the context of the record before us. "[T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond [to a *Brady* request] might have had on the preparation or presentation of the defendant's case." *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384. The Supreme Court noted in *Kyles* that,

> While the definition of *Bagley* materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. *This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.* But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, see *Brady*, 373 U.S. at 87, 83 S.Ct. 1194 [at 1196–97] ), *the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.*

*Kyles*, 514 U.S. at 437–38, 115 S.Ct. at 1567–68 (emphasis added). We further note the United States Supreme Court's decision in *Agurs*, which made clear the prosecutor's duty to volunteer material exculpatory evidence to the defense even absent a specific request for such evidence by the defense. *Agurs*, 427 U.S. at 110, 96 S.Ct. at 2400–01.

 While Tuma's counsel could have asked for a recess to listen to the audio tape of L.S.'s interview once he became aware of it during the trial, his failure to do so did not excuse or dispense with the prosecutor's affirmative duty to discover any favorable evidence known to others acting on the Commonwealth's behalf and to turn it over to Tuma.[10] The

---

**10.** Aside from the straw men not part of our analysis or ultimate holding in this case that Judge Kelsey raises and promptly strikes down with respect to any application of the Rules of Professional Conduct for attorneys and any foundational deficiencies regarding the admission of the audio tape, the thrust of Judge Kelsey's dissent flows from his initial flawed premise that the audio tape was "available during trial." Judge Kelsey reasons that, since Tuma's counsel became aware of the audio tape's existence during the trial, any burden to learn the particulars of the exculpatory nature of the tape's contents fell upon Tuma, and he relies upon our Supreme Court's decision in *Read v. Virginia State Bar*, 233 Va. 560, 357 S.E.2d 544 (1987), to support his analysis.

*Read*, in turn, relied upon a decision of the United States Court of Appeals for the Tenth Circuit holding that " '*Brady* is not violated when *Brady* material is available to defendants during trial.' " *Id.* at 565, 357 S.E.2d at 547 (quoting *United States v. Behrens*, 689 F.2d 154, 158 (10th Cir.1982)). In *Read*, the Court held that there was no *Brady* violation where the exculpatory information was already available for use by the defense. *Id.* at 563–64, 357 S.E.2d at 546. We fail to see how *Read* provides any support for the conclusion ultimately reached by Judge Kelsey. In *Read*, unlike this case, the defense had possession of the exculpatory information from both the witnesses themselves and from the proffer made by the prosecutor on the record after it rested its case.

Judge Kelsey's dissent also quotes *United States v. Elmore*, 423 F.2d 775 (4th Cir.1970), and observes that "no *Brady* violation occurs when the impeachment information was disclosed 'well before the end of the trial.' " In Judge Kelsey's view, it is apparently enough to satisfy *Brady* by merely acknowledging the existence of the tape without the necessity for a prosecutor to do more to satisfy the rigors of due process. However, the law is clear that a prosecutor's burden under *Brady* is not so amorphous and the approach taken by Judge Kelsey has been affirmatively rejected by the Supreme Court in *Banks*. The notion that

> [a] rule thus declaring "prosecutor may hide, defendant must seek" is not tenable in a system constitutionally bound to accord defen-

Commonwealth's Attorney should have reviewed the audio tape of L.S.'s interview in order to satisfy her duty to learn of any favorable evidence known to Dinwiddie DSS or the police investigating the case. The prosecutor's negligible efforts to comply with her responsibilities fell far short of what her oath of office and the law required of her. She did not listen to the tape yet represented to the trial court that it was not exculpatory, she relied on the investigator's inaccurate and incomplete notes of the interview without exercising any independent judgment in the matter, and she offered no assistance at any point in obtaining the tape for examination by Tuma's counsel.

---

dants due process. "Ordinarily, we presume that public officials have properly discharged their official duties. We have several times underscored the special role played by the American prosecutor in the search for truth in criminal trials." Courts, litigants, and juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] ... plainly rest[ing] upon the prosecuting attorney, will be faithfully observed."
*Banks*, 540 U.S. at 696, 124 S.Ct. at 1275 (internal citations omitted). It is the factual contents of the statements memorialized by the recording that the prosecutor was obligated to disclose, not the mere existence of their container.

Moreover, Judge Kelsey's dissent also contends that the judgment should be affirmed on what is essentially a "right result, wrong reason" basis since the prosecutor in this case never argued at trial the position Judge Kelsey's dissent adopts on appeal—that the strictures of *Brady* had been satisfied because Tuma "had access to the tape during trial." To the contrary, such an analysis is inconsistent with the factual finding actually made. Relying on the representations of the prosecutor, the trial court concluded that the contents of the tape were not exculpatory and therefore the prosecutor had no duty to produce it. *See Perry v. Commonwealth*, 280 Va. 572, 579, 701 S.E.2d 431, 435 (2010) ("[C]ases are only proper for application of the right result for the wrong reason doctrine when the evidence in the record supports the new argument on appeal, and the development of additional facts is not necessary.").

Finally, despite Judge Kelsey's apparent conclusion that the prosecutor's statement that Tuma's counsel "can listen to it if he wants to" satisfied her affirmative duty under *Brady*, no timely disclosure ever actually occurred, because the prosecutor never produced the tape for the defense or disclosed the exculpatory nature of its contents at trial or at any other time. Furthermore, the prosecution's agent, Dinwiddie DSS, resisted every effort by the defense to obtain the tape and while it was ultimately produced after Dinwiddie DSS's efforts to resist doing so were exhausted, this was not done until well after trial and certainly not in a timely fashion such that it could be used to cross-examine L.S., Investigator Gilliam, or Ms. Scheid.

The record before us does not indicate when the prosecutor became aware of the existence of the audio tape, but it does reflect that after becoming aware of it, she simply turned a blind eye to an accessible audio recording of an investigatory interview of the only victim and eyewitness in the case on whose testimony the conviction rested. Never having listened to it, the prosecutor could not have known if the evidence in the audio tape was exculpatory, yet she nevertheless represented to the trial court that it was not.

Further, despite the prosecutor's representation to the trial court that counsel for Tuma "can listen to it if he wants to," with the benefit of the hindsight provided by the record in this case, the futility of any request Tuma might have made at trial for a recess to listen to the audio tape is obvious. The prosecutor never produced the tape, either during the trial or during Tuma's post-trial efforts to obtain access to the tape even as Dinwiddie DSS resisted Tuma's repeated requests to turn the tape over.

We hold that on this record, the failure of the prosecution to turn over L.S.'s interview statements to Tuma prior to cross-examination of L.S. at trial violated his due process right to a fair trial and undermines confidence in the outcome of the trial, regarding both the jury's determination of Tuma's guilt and their decision with respect to Tuma's sentence. On this basis, we find that the trial court erred in not granting Tuma's motion for a new trial based upon after-discovered exculpatory evidence and we reverse Tuma's convictions and remand for a new trial if the Commonwealth so elects.

## B. Admissibility of the Audio Tape

In Tuma's remaining assignment of error, he argues that the trial court erred in refusing to allow the jury to hear the audio tape and admit it into evidence, as it was clearly relevant to the case. Our resolution of the first assignment of error is dispositive of our ultimate holding reversing Tuma's convictions, thus we need not address the admissibility of the audio tape. *See Powell v. Commonwealth,* 261 Va. 512, 531–32, 552 S.E.2d 344, 355 (2001) (the Court does not need to

address all assignments of error where the Court's opinion on other issues raised are dispositive of the ultimate holding reversing the appellant's convictions). Further, the issue raised in Tuma's second assignment of error will not arise at a new trial. *See e.g. 1924 Leonard Rd., L.L.C. v. Van Roekel,* 272 Va. 543, 559, 636 S.E.2d 378, 388 (2006) (the Court declined to address issues that would not affect its judgment and would not arise at a new trial); *cf. Powell,* 261 Va. at 535, 552 S.E.2d at 357 (where the Court reversed a capital murder conviction, it found that it must consider other issues that may be relevant to a trial on remand for the murder offense). The trial court did not admit the audio tape into evidence because Tuma had not listened to the tape and did not know what was on the tape at the time he asked the trial court to admit it into evidence and to play it for the jury. Should the Commonwealth elect to retry the case, the same issue regarding the admissibility of the audio tape would not arise because Tuma's counsel now has access to the tape. The question of admissibility of the tape into evidence would then be within the discretion of the trial court and governed by the applicable rules of evidence. *Midkiff v. Commonwealth,* 280 Va. 216, 219, 694 S.E.2d 576, 578 (2010). Therefore, we need not address this assignment of error.

## III. Conclusion

For these reasons, we reverse the judgment of conviction and remand this case to the trial court for a new trial consistent with this opinion if the Commonwealth is so advised.

*Reversed and remanded.*

KELSEY, J., dissenting.

On appeal, Tuma has the burden of making "*each* of *three* showings," *Skinner v. Switzer,* —— U.S. ——, ——, 131 S.Ct. 1289, 1300, 179 L.Ed.2d 233 (2011) (emphasis added), to undermine his criminal conviction under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

- First, Tuma must establish the undisclosed evidence was "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Skinner* [—— U.S. at ——] 131 S.Ct. at 1300 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 [119 S.Ct. 1936, 1948, 144 L.Ed.2d 286] (1999)).

- Second, he must prove "the State suppressed the evidence, 'either willfully or inadvertently.' " *Id.*

- Third, Tuma must show he suffered "prejudice," *id.*, by proving a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, [—— U.S. ——, ——] 132 S.Ct. 627, 630 [181 L.Ed.2d 571] (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 [129 S.Ct. 1769, 1783, 173 L.Ed.2d 701] (2009)).

These factors are not to be weighed in aggregate, with a strong showing on one compensating for a weak showing on another. Nor should they be blurred together into indistinct variables. Each of the "three components of a true *Brady* violation," *Strickler*, 527 U.S. at 281, 119 S.Ct. at 1948, must be independently proven on appeal by the defendant.

In this case, Tuma lays heavy emphasis on the first and third components of his claimed *Brady* violation. He addresses the second component—proof that the "State suppressed the evidence," *Skinner*, —— U.S. at ——, 131 S.Ct. at 1300— almost as an afterthought. To be sure, he all but assumes it away in a highly emotive narrative claiming the trial judge joined in the suppression effort by denying Tuma access to the evidence at trial. Neither the law nor the record supports this assertion.

I.

### BRADY & DSS VICTIM WITNESS STATEMENTS

With few exceptions, DSS interviews of sexual assault victims must be orally recorded. *See Jones v. West*, 46 Va.App. 309, 323, 616 S.E.2d 790, 798 (2005) (citing 22 Va. Admin. Code § 40–705–80(B)(1)). For *Brady* purposes, the audio

recording is nothing more than a statement by a victim witness. If the statement claims the defendant committed the crime and does not suggest otherwise, it is inculpatory—not exculpatory. Neither the constitutional *Brady* doctrine nor state law governing discovery in criminal cases [11] requires a prosecutor to provide inculpatory witness statements to a defendant before, during, or after trial. After all, "the Constitution does not require the prosecutor to share all useful information with the defendant." *United States v. Ruiz*, 536 U.S. 622, 629, 122 S.Ct. 2450, 2455, 153 L.Ed.2d 586 (2002). "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977).

A witness statement, even if facially inculpatory before trial, can become exculpatory at trial if the victim takes the stand and testifies in a manner inconsistent with the prior statement. If this occurs, prosecutors then have an obligation to produce the inconsistent prior statement for defense counsel to possibly use for impeachment purposes. This disclosure obligation, however, only arises at trial—not prior to trial— where, as here, the pretrial statement allegedly contradicts the declarant's testimony at trial. In this context, impeachment evidence does not exist until a witness takes the stand and says something impeachable.

For this reason, Virginia follows the prevailing view that "*Brady* is *not* violated" when impeachment material "is available to defendants *during trial.*" *Read v. Va. State Bar*, 233 Va. 560, 565, 357 S.E.2d 544, 547 (1987) (emphasis added) (quoting *United States v. Behrens*, 689 F.2d 154, 158 (10th Cir.1982)). As a matter of law, "no *Brady* violation" can occur

---

**11.** Rule 3A:11 governs a defendant's discovery rights in a criminal proceeding. "The Rule specifically does not authorize discovery of 'statements made by Commonwealth witnesses or prospective ... witnesses to agents of the Commonwealth ... in connection with the investigation or prosecution of the case.'" *Juniper v. Commonwealth*, 271 Va. 362, 394, 626 S.E.2d 383, 404 (2006) (quoting Rule 3A:11(b)(2)).

when the defendant learns of the potential impeachment evidence "in sufficient time to make use of [it] at trial." *Read,* 233 Va. at 564, 357 S.E.2d at 546. As Judge Easterbrook has explained: "A prosecutor must disclose information favorable to the defense, but disclosure need not precede trial. *Brady* thus is a disclosure rule, not a discovery rule. Disclosure even in mid-trial suffices if time remains for the defendant to make effective use of the exculpatory material." *United States v. Higgins,* 75 F.3d 332, 335 (7th Cir.1996) (citation omitted); *see generally* 6 Wayne R. LaFave, *Criminal Procedure* § 24.3(b), at 365 (3d ed.2007) (observing that "the prosecution should be able to satisfy its constitutional obligation by disclosure at trial").

It does not matter that the prosecutor was or should have been "aware of the information" prior to trial. *Read,* 233 Va. at 564, 357 S.E.2d at 546 (citing *United States v. Darwin,* 757 F.2d 1193 (11th Cir.1985)). Nor does it matter if the defendant must recall a witness for the purpose of impeachment:

The point in the trial when a disclosure is made, however, is not in itself determinative of timeliness. We agree with those circuits holding that a defendant must show that the failure to earlier disclose prejudiced him because it came so late that the information disclosed could not be effectively used at trial. Appellant here made no such showing. In fact, *although Dunn had completed his testimony, the trial itself was far from over. Appellant could have recalled Dunn for further questioning but chose not to.*

*Darwin,* 757 F.2d at 1201 (emphasis added and citations omitted), quoted in part by *Read,* 233 Va. at 564–65, 357 S.E.2d at 546–47; *see also United States v. Davis,* 306 F.3d 398, 421 (6th Cir.2002) (holding disclosure of impeachment material during trial, when witnesses were subject to recall, satisfied *Brady* ).[12]

---

12. *See also United States v. Mangual–Garcia,* 505 F.3d 1, 5–6 (1st Cir.2007); *United States v. Delgado,* 350 F.3d 520, 527 (6th Cir.2003); *United States v. Kime,* 99 F.3d 870, 882 (8th Cir.1996); *United States v. Catano,* 65 F.3d 219, 227 (1st Cir.1995); *United States v. Gordon,* 844

In *Read*, the Virginia Supreme Court relied on *United States v. Elmore*, 423 F.2d 775 (4th Cir.1970), which held no *Brady* violation occurs when the impeachment information was disclosed "well before the end of the trial," particularly given that defense counsel could have requested "a continuance for whatever further time might have been necessary." *Id.* at 780. This common-sense principle parallels the disclosure requirements of Rule 3A:11. A defendant who "failed to move for a continuance or even for a recess in order to consider the material" cannot "be heard to complain that he had insufficient time to prepare for trial." *Frye v. Commonwealth*, 231 Va. 370, 384, 345 S.E.2d 267, 277 (1986); *see Madsen v. Dormire*, 137 F.3d 602, 605 (8th Cir.1998) (finding no *Brady* violation because defendant "did not request a continuance" to examine the evidence disclosed for the first time at trial); *Higgins*, 75 F.3d at 335 ("If counsel needed more time, she had only to ask; yet she did not seek a continuance. Nothing more need be said.").[13]

*Brady* is not a canon of prosecutorial ethics, as the majority mistakenly assumes. *Ante*, at 285–88, 726 S.E.2d at 371–72. *Brady* enforces the threshold requirements of the Due Pro-

---

F.2d 1397, 1403 (9th Cir.1988); *United States v. Adams*, 834 F.2d 632, 634–35 (7th Cir.1987); *United States v. Kopituk*, 690 F.2d 1289, 1340 (11th Cir.1982); *State v. Aikins*, 261 Kan. 346, 932 P.2d 408, 437 (1997); *People v. Monroe*, 17 A.D.3d 863, 864, 793 N.Y.S.2d 276 (N.Y.App.Div.2005).

**13.** This point has been made in many different disclosure contexts. *See, e.g., Davis v. Commonwealth*, 230 Va. 201, 204, 335 S.E.2d 375, 377 (1985) (finding no prejudice under Rule 3A:11 where defendant "did not request either a postponement or a continuance"); *Knight v. Commonwealth*, 18 Va.App. 207, 215, 443 S.E.2d 165, 170 (1994) (taking into account that the defendant "did not request a continuance in light of the late disclosure"). *Accord United States v. Collins*, 415 F.3d 304, 310–11 (4th Cir.2005); *United States v. Gamez–Orduno*, 235 F.3d 453, 461–62 (9th Cir.2000); *United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir.1993); *United States v. Diaz–Villafane*, 874 F.2d 43, 47 (1st Cir.1989); *United States v. Holloway*, 740 F.2d 1373, 1381 (6th Cir.1984); *Apolinar v. State*, 106 S.W.3d 407, 421 (Tex.Crim.App.2003), *aff'd on other grounds*, 155 S.W.3d 184 (Tex.Crim.App.2005); *Gutierrez v. State*, 85 S.W.3d 446, 452 (Tex.Crim.App.2002); *Rodriguez v. State*, 962 P.2d 141, 145–46 (Wyo.1998); LaFave, *supra*, at 365.

cess Clause, not a state's code of ethics. *See Cone,* 556 U.S. at 470 n. 15, 129 S.Ct. at 1783 n. 15 ("Although the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady,* only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations." (citing *inter alia* ABA Model Rule of Prof'l Conduct 3.8(d), which Virginia adopted in 2000 as Va. Rule of Prof'l Conduct 3.8(d))); *see also Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995) (noting that *Brady* "requires less of the prosecution than" ABA Model Rule 3.8(d)); *see also* VSB Legal Ethics Op. 1862 (draft published Mar. 15, 2012).[14] In *Brady* cases, therefore, an appellate court sits not as a disciplinary committee of the state bar—but rather as a court of review, ensuring only that the criminal conviction satisfies the threshold requirements of due process.

## II.

### DISCLOSURE OF THE TAPE AT TRIAL

In this case, a recorded pretrial interview of the victim witness alleged Tuma's guilt in considerable detail. The recorded statement was internally consistent and, thus, inculpatory on its face. The Commonwealth had no duty to provide Tuma with the recorded interview unless and until the victim took the stand and testified inconsistently with it. Several statements from the recorded interview, Tuma claims, could have been used to impeach the victim's testimony at trial. Perhaps so—but that only meant the recording had to be made "available" to Tuma's counsel "during trial," *Read,* 233

---

**14.** *Accord Brooks v. Tennessee,* 626 F.3d 878, 892–93 (6th Cir.2010) (noting "the *Brady* standard for materiality is less demanding than the ethical obligations imposed on a prosecutor"). *See also* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 09–454 (2009) (rejecting the "incorrect assumption" that Rule 3.8(d) merely "codif[ied] the Supreme Court's landmark decision in *Brady v. Maryland*" and acknowledging that the "ethical duty" of the rule is "separate from disclosure obligations imposed under the Constitution, statutes, procedural rules, court rules, or court orders").

Va. at 565, 357 S.E.2d at 547, so counsel could decide whether, and if so, how, to use the recorded statement.

It was certainly no secret that the recording existed. Prior to trial, Tuma's counsel met with the investigating officer and directly "asked him whether or not there was a tape" of the victim's interview. App. at 516. The investigator said he believed so, but was not sure. *Id.* On appeal, Tuma's counsel admits he had an "indication" and a "feeling" prior to trial that a tape existed. *See* Oral Argument Audio at 6:45 to 6:55.

The existence of the tape was confirmed early in the trial. The investigating officer, the second of the Commonwealth's six witnesses, testified he believed the interview was recorded. The DSS investigator, the third witness, testified the interview was recorded and she had the tape with her in the courtroom. The entire interview, she added, lasted only thirty to forty minutes.

When Tuma's counsel learned of the tape's presence in the courtroom, he did not ask for permission to listen to it. Instead, he inexplicably moved to admit the recorded interview, in its entirety, *into evidence*—even though neither he, the prosecutor, nor the trial judge had listened to it. The trial judge correctly refused to admit the tape into evidence under such circumstances. Even if portions of the audiotape had qualified for impeachment, only those specific portions could have been presented to the jury, and only after Tuma's counsel had laid the proper foundation necessary for impeachment.[15] He could not do that without first listening to the recorded statement.

---

15. Tuma's counsel apparently thought it appropriate to put the tape in the player, press the play button, and admit into evidence every word, from start to finish. Suffice it to say, the trial judge correctly understood impeachment simply does not work that way. "Extrinsic evidence of a prior inconsistent oral statement by a witness is not admissible unless the witness is first afforded an opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require.... Extrinsic evidence of a witness's prior inconsistent statement is not admissible unless the witness denies or does not remember the prior inconsistent statement. Extrinsic evidence of collateral statements is

The trial judge's evidentiary ruling, however, was not a *Brady* ruling precluding Tuma's counsel from listening to the tape. Indeed, the record shows the judge twice made clear to Tuma's counsel that he could listen to the tape: "You can go listen to it if you want to on your own time," the judge explained. App. at 318. "You can take it off and listen to it," the judge clarified. *Id.* "He can listen to it if he wants to," the prosecutor concurred. *Id.* at 319. Yet, as Tuma's counsel concedes, he *never once asked* for the opportunity to listen to the tape outside the jury's presence. *See* Oral Argument Audio at 32:30 to 32:40.[16]

In his post-trial hearing on the *Brady* issue, Tuma's counsel argued he was denied access to the tape before and after trial but *conceded* he had access to the tape *during* trial. App. at 523–24. Tuma's counsel admitted the prosecutor "*at the trial* said *I could have access to it* and things of that nature." *Id.* at 523 (emphasis added). Counsel similarly acknowledged the trial court "was clear *at the trial* that I would be able to get it and listen to it." *Id.* at 537 (emphasis added). These concessions refute any suggestion that the trial court precluded Tuma's counsel from listening to the tape at trial.[17]

not admissible." Boyd–Graves Conference, *A Guide to Evidence in Virginia* § 613(a)(ii), at 75 (2012), soon to be Va. Rule of Evid. 2:613(a)(ii) (effective July 1, 2012); *see also* Charles E. Friend, *The Law of Evidence in Virginia* § 4–5(c)(1), at 147 (6th ed. 2003).

**16.** The majority's criticism of DSS's reluctance to release the tape *after* trial contributes nothing to the analysis. The *Brady* violation either occurred or did not occur *at* trial. Just as a disclosure after trial cannot remedy a *Brady* violation at trial, a nondisclosure after trial cannot violate *Brady* if a proper disclosure was made at trial.

**17.** These undisputed facts, coupled with Tuma's concessions, undermine the majority's effort to mischaracterize my dissent as a right-result-wrong-reason scenario requiring additional factfinding. *See ante,* at 301–02 n. 10, 726 S.E.2d at 379 n. 10. I also find no merit in the assertion that my reasoning is "inconsistent" with the trial court's factual findings. *Id.* The trial court concluded no *Brady* violation occurred because the tape was not exculpatory or prejudicial. I conclude no *Brady* violation occurred *even if* the tape were exculpatory and prejudicial because Tuma's counsel had access to it during trial. The two views are entirely consistent—both conclude no *Brady* violation

These facts also belie the inapt characterization of this case as one which, if affirmed, would suggest the "prosecutor may hide" but the "defendant must seek." *Ante*, at 301–02 n. 10, 726 S.E.2d at 379 n. 10. The majority lifts this language from *Banks v. Dretke*, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004), which involved a prosecutor *successfully* hiding information from a defendant at trial. Here, unlike *Banks*, the prosecutor did not hide anything: Two of her witnesses openly *disclosed* the existence of the tape, and the prosecutor (as well as the trial judge) *suggested* Tuma's counsel "listen to it if he wants to." App. at 319. This was not a game of "hide" and "seek." *Ante*, at 301–02 n. 10, 726 S.E.2d at 379 n. 10. The tape was *found*—in the courtroom, early in the trial, with plenty of time to put it to whatever use Tuma's counsel may have desired.

In short, Tuma's argument on appeal—that the "denial of the information contained on the tape amounted to a prejudice against the defendant," Appellant's Br. at 32—rests on one of two false assumptions. If Tuma means he was denied the tape before trial, he mistakenly assumes *Brady* required pretrial disclosure. It did not. The tape did not become exculpatory until the victim testified in a manner inconsistent with it. "*Brady* is *not* violated" when impeachment material "is available to defendants *during trial.*" *Read*, 233 Va. at 565, 357 S.E.2d at 547 (emphasis added and citation omitted).

If Tuma means he was denied the tape at trial, he mistakenly assumes the court's refusal to "play the tape" in the presence of the jury meant that he could not play it for himself. The trial judge could not have been clearer: Tuma's counsel could listen to it, but the tape would not be admitted into evidence without the proper foundation—necessarily requiring that someone in the courtroom (usually the proponent of the evidence) listen to it first.

The majority excuses counsel's failure to listen to the tape on the paradoxical ground that it will not excuse the prosecu-

---

occurred (relying on different prongs of the *Brady* test) and neither logically nor legally negates the other.

tor for her failure to do the same. "While Tuma's counsel *could have* asked for a recess to listen to the audio tape of L.S.'s interview once he became aware of it during the trial," the majority reasons, "his failure to do so did not excuse or dispense with the prosecutor's affirmative duty to discover any favorable evidence known to others acting on the Commonwealth's behalf and to turn it over to Tuma." *Ante,* at 301, 726 S.E.2d at 379 (emphasis added). The majority cites no authority in support of this reasoning, because none exists.

Under settled principles, if Tuma's counsel truly had access to the tape during trial for the purpose of impeachment, there was no *Brady* violation as a matter of law—no matter what the prosecutor did or did not do. *See United States v. Smith Grading & Paving, Inc.,* 760 F.2d 527, 532 n. 6 (4th Cir.1985) (explaining that "the fact that disclosure came from a source other than the prosecutor is of no consequence"); *see also supra,* at 307 n. 12, 308 n. 13, 726 S.E.2d at 382 n. 12, n. 13 (citing *Brady* cases not excusing a defendant's failure to ask for a recess, continuance, or an opportunity to recall a witness).[18]

In the end, the majority sidelines this debate as unimportant because "the futility of any request Tuma might have made at trial for a recess to listen to the audio tape is obvious." *Id.* at 303, 726 S.E.2d at 380. This *ipse dixit* implies a bold accusation.[19] The majority apparently believes

---

**18.** It is for this reason we can say "no *Brady* violation occurs 'if the evidence in question is available to the defendant from ... sources [other than the Commonwealth].'" *Gagelonia v. Commonwealth,* 52 Va.App. 99, 113, 661 S.E.2d 502, 509–10 (2008) (alteration in original) (quoting *United States v. Wilson,* 901 F.2d 378, 380 (4th Cir.1990)).

**19.** I also question other rhetorical excesses in the majority opinion, such as the description of the "asymmetry" of the criminal justice system, the "fertile ground for many lawyer jokes," the "apparent hopelessness" of advocacy of defense counsel, and prosecutors' alleged frustration with the "unequal combat" required by due process. *Ante,* at 288, 726 S.E.2d at 372. I similarly wince at the declaration that criminal defense counsel have no "obligation to ascertain or present the truth," but, rather, may use whatever stratagem available to "confuse a witness, even a truthful one, or make him appear at a disadvantage, unsure or indecisive" in pursuit of an acquittal. *Id.* (citation omitted). If the majority means only to say *Brady* requires prosecutors to divulge

it "obvious" the trial judge would have arbitrarily denied a brief recess (if one had been requested) for Tuma's counsel to listen to the tape—after twice suggesting that he do so. Nothing in the record suggests this censorious supposition is true, much less obvious. We will never truly know, of course, because Tuma's counsel never asked for a brief recess to listen to the tape. I do not see how the trial judge can be blamed for that.

I respectfully dissent.

BEALES, J., dissenting.

Today I fear the Court effectively creates a broader rule under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), than the United States Supreme Court and Virginia's appellate courts have ever before established under *Brady.* The majority opinion effectively holds in this case that the failure to disclose *any* prior inconsistencies by a complaining witness in a child sexual abuse case *per se* renders that evidence "material" under *Brady* and its progeny, and, therefore, will require reversal of the conviction.[20] Today's holding, I fear, waters down the clear and settled requirement for a defendant to establish that he has actually been *prejudiced* by the failure to disclose impeachment evidence in order to prevail in a *Brady* claim and get his conviction overturned.

I find no basis in the case law for applying the materiality requirement of a *Brady* claim as loosely as the majority does

exculpatory evidence but does not similarly require defense counsel to divulge inculpatory evidence, simply saying so should suffice to make the point.

**20.** Specifically, the majority opinion in this case holds,

 [O]nce L.S.'s interview statements *proved inconsistent* with her later account of the sexual assaults, whether when interviewed by the prosecutor before trial, or, at the latest, at trial immediately following her direct testimony, *the audio tape of the interview became evidence material* to Tuma's guilt and/or punishment and should have been immediately disclosed when the discrepancy became known or should have become known to the prosecutor.

(Emphasis added).

here—particularly in a case, such as this one, where the new impeachment evidence does not call into question whether the witness misidentified the defendant, does not call into question whether the witness had a motive to fabricate the allegation of sexual abuse, and does not call into question whether the witness revealed something during her interview with the authorities that otherwise would significantly damage the credibility of her core accusation of sexual abuse at trial. To the extent L.S.'s statements before trial and at trial were inconsistent (and were not already known from the pre-trial disclosure of the written summary of the interview), several such inconsistencies were presented to the jury by defense counsel and others could have been presented by defense counsel based on what was learned during the trial. Moreover, as I discuss more at length below, the only actual type of inconsistency here from L.S. that would even be the proper subject of a *Brady* analysis in this case concerned the same type of inconsistency that was already presented to—and considered by—the jury.

For these reasons—and for the reasons that follow—I respectfully dissent from the majority's opinion that reverses appellant's convictions for taking indecent liberties with a child, for aggravated sexual battery of a child, and for animate object sexual penetration of a child. I would affirm each of those convictions.[21]

---

**21.** I would remand the matter to the trial court for the very limited purpose of correcting a clerical error in the final sentencing order. The sentencing order states that appellant's sentence for aggravated sexual battery was 25 years—which is greater than the statutory maximum of 20 years of imprisonment for an aggravated sexual battery conviction. However, it is clear from the trial transcript that the jury recommended a 25-year sentence for animate object sexual penetration (which is within the statutory maximum of life in prison)—not for aggravated sexual battery (for which the jury recommended a 5-year sentence). It is also clear from the trial transcript that the trial judge sentenced appellant in accordance with the jury's recommendations. Thus, the trial court's final order simply reverses appellant's sentences for aggravated sexual battery and for animate object sexual penetration, and I would remand the matter to the trial court for the specific purpose of correcting this clerical error.

## I. THE *BRADY* RULE

In *Brady,* the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97. " 'If the defendant does not receive such evidence, or if the defendant learns of the evidence at a point in the proceedings when he cannot effectively use it, his due process rights as enunciated in *Brady* are violated.' " *Muhammad v. Warden of Sussex I State Prison,* 274 Va. 3, 4, 646 S.E.2d 182, 186 (2007) (quoting *Muhammad v. Commonwealth,* 269 Va. 451, 510, 619 S.E.2d 16, 49–50 (2005)).

However, case law makes very clear that "constitutional error occurs, and the conviction must be reversed, only if the evidence is material" in the *Brady* sense. *Teleguz v. Commonwealth,* 273 Va. 458, 488, 643 S.E.2d 708, 727 (2007); *see United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 3381–82, 87 L.Ed.2d 481 (1985). According to the United States Supreme Court's decision in *Bagley,* evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383.

The "reasonable probability" discussed in *Bagley* is defined as "a probability sufficient to *undermine confidence in the outcome.*" *Id.* (emphasis added). Thus, what the *Brady* rule really tests is whether the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). If the verdict is no longer worthy of confidence, then the defendant has been prejudiced under *Brady* and is entitled to a new trial. Conversely, if the verdict remains worthy of confidence, then the defendant has not been prejudiced under *Brady* and a new trial is not required. Thus, materiality under *Brady* is dependent on

prejudice to the defendant, as the Supreme Court of Virginia has explained:

> "There are three components of a violation of the rule of disclosure first enunciated in *Brady:* a) The evidence not disclosed to the accused must be favorable to the accused, either because it is exculpatory, or because it may be used for impeachment; b) the evidence not disclosed must have been withheld by the Commonwealth either willfully or inadvertently; and c) *the accused must have been prejudiced.*"

*Garnett v. Commonwealth,* 275 Va. 397, 406, 657 S.E.2d 100, 106 (2008) (emphasis added) (quoting *Workman v. Commonwealth,* 272 Va. 633, 644–45, 636 S.E.2d 368, 374 (2006)).

Viewed in this light, the withholding of impeachment evidence is not enough to constitute a *Brady* violation—rather, the withheld impeachment evidence must be "material" in the *Brady* sense, thereby causing prejudice to the defendant sufficient to undermine confidence in the outcome. *See Lovitt v. Warden of Sussex I State Prison,* 266 Va. 216, 245, 585 S.E.2d 801, 818 (2003) ("A prosecutor's suppression of impeachment evidence creates a due process violation *only if* the suppression deprives the defendant of a fair trial under the *Brady* standard of materiality." (emphasis added) (citing *Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381; *McDowell v. Dixon,* 858 F.2d 945, 949 (4th Cir.1988))).

I largely agree with the majority opinion's very thorough description of a prosecutor's responsibilities and duties to uphold the principles of justice. Furthermore, I would assume without deciding for the purposes of this case that the prosecutor here *should* have listened to the audiotape of L.S.'s interview by Ms. Jon Webster Scheid of Dinwiddie County's Department of Social Services and Investigator Dwayne Gilliam of the Dinwiddie County Sheriff's Office prior to trial— or, at least, once the issue of the audiotape was raised during the trial. As the majority correctly notes, the prosecutor in this case made certain representations to the trial court

concerning the contents of the audiotape without first having actually listened to the audiotape.

However, the ultimate focus of the *Brady* test is *not* and never has been to determine what steps the prosecutor should or should not have taken in a given case. Moreover, the purpose of the *Brady* test is not to catalog the areas where a witness' testimony differs from her prior statements. Both of these inquiries certainly can be relevant considerations *within* a *Brady* analysis, but the ultimate issue under *Brady* is whether the defendant has or has not been prejudiced to a constitutionally significant degree. In the words of the United States Supreme Court, "prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 282, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999).

"The absence of prejudice, by itself, defeats [a] *Brady* claim and renders all other issues analytically superfluous." *Deville v. Commonwealth,* 47 Va.App. 754, 758, 627 S.E.2d 530, 532 (2006). In the final analysis, therefore, the rule in *Brady* tests whether the defendant has been prejudiced to the extent that confidence in the outcome of the trial has, to "a reasonable probability," been *undermined. See Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383. Simply put, confidence in the outcome of the trial has *not* been undermined here.

## II. ANALYSIS OF APPELLANT'S *BRADY* CLAIM

Here, we have a seven-year-old witness, L.S., who, despite her young age, has consistently asserted that she was sexually abused and has consistently asserted that appellant William Tuma was the perpetrator of the sexual abuse. Nothing that L.S. said that was recorded on the audiotape of the interview with Ms. Scheid and Investigator Gilliam in any way contradicts the allegation that she was sexually abused and that appellant sexually abused her. For example, appellant cites no statements from L.S. during the audiotaped interview calling into question whether L.S. misidentified the perpetrator of the sexual abuse, or raising the possibility that someone else (and not appellant) sexually abused her, or revealing even

the slightest hint of a motive to fabricate the sexual abuse allegation on her part.

L.S. also has consistently asserted that appellant sexually abused her at the white house next to the horses on Boydton Plank Road in Dinwiddie County,[22] and absolutely no statements that were recorded during the interview contradict that assertion either. L.S. testified at trial, of course, that the sexual abuse occurred at other locations *in addition* to the white house—even though the audiotape of the interview reflects that she told Ms. Scheid and Investigator Gilliam that the sexual abuse occurred only at the white house and stated that the sexual abuse did not occur at two of these other locations she mentioned at trial (i.e., the Green Acres Trailer Park and her grandmother's house). This inconsistency is the essence of appellant's *Brady* claim—the only real inconsistency in L.S.'s account that could not have been discovered based on Investigator Gilliam's written summary of the interview with L.S.

However, any conceivable impact arising from this inconsistency must be considered minimal when appellant's *Brady* claim is " 'evaluated in the context of the entire record' "—in the manner that binding authority instructs this Court to review any claim under *Brady. Robinson v. Commonwealth*, 220 Va. 673, 676, 261 S.E.2d 318, 320 (1980) (quoting *United States v. Agurs*, 427 U.S. 97, 104, 112, 96 S.Ct. 2392, 2398, 2402, 49 L.Ed.2d 342 (1976)).

### A. *The Jury Was Aware that L.S. Made Prior Inconsistent Statements*

Appellant was charged with one count of taking indecent liberties with a child, one count of aggravated sexual battery, and one count of animate object sexual penetration. At a minimum, L.S., despite her young age, has consistently asserted that appellant sexually abused her five to ten times at the

---

**22.** At trial, this residence was referred to as both the "white house" and the house "next to the horses." For purposes of this dissent, this residence simply will be referred to as the "white house."

white house—an assertion that was reflected both on the audiotape of the interview with Ms. Scheid and Investigator Gilliam and in the investigator's written summary of the interview, which was provided to the defense before trial. Appellant could have been convicted of all three charged offenses if the jury believed that *even one episode* of sexual abuse occurred at the white house, as asserted by L.S. during the interview and then at trial.[23]

The trial transcript establishes that L.S.'s credibility was challenged by the defense at trial. The jury could readily compare statements L.S. made to Ms. Scheid and Investigator Gilliam during her pre-trial interview with the statements L.S. made during her testimony at trial. Inconsistencies were pointed out during cross-examination of the Commonwealth's witnesses and by appellant's trial attorney during closing argument.

Based on the defense's cross-examination of Investigator Gilliam and Ms. Scheid, the jury was aware that L.S. asserted *for the first time at trial* that appellant sexually abused her three times per week while they were staying at an RV park in Prince George County. This assertion was never made during the audiotaped interview. In fact, the Prince George RV park was *never even mentioned* during this interview.

To be sure, this prior inconsistency was underscored during Ms. Scheid's cross-examination, during which the following exchange with appellant's trial attorney occurred:

---

**23.** This statement does not end the analysis—on appeal in this case, we are not, of course, reviewing the sufficiency of the evidence supporting appellant's convictions (which would be overwhelming) or reviewing for harmless error. *Kyles,* 514 U.S. at 434–36, 115 S.Ct. at 1565–67. However, it is certainly significant to consider that the jury was not asked to determine if one and only one *specific* allegation of abuse was credible and true. From the five to ten times—or, based on her trial testimony, more than ten times—that L.S. alleged that the sexual abuse occurred, the jury in this case was entitled to convict appellant of the charged offenses even if it believed that the charged sexual abuse occurred only once and rejected *all* of L.S.'s *other* assertions of sexual abuse on other occasions. And the same principle holds true with a new jury, of course, now that the matter has been remanded for a new trial.

Q: Nothing happened in a RV park in Prince George?

A: I know nothing.

Q: That never came [up]?

A: I know nothing.

Moreover, appellant's trial attorney alluded to L.S.'s testimony about the Prince George RV park during closing argument, when counsel reminded the jury that L.S. at one point testified "that it happened three times a week"—a clear reference to L.S.'s testimony about the sexual abuse at the Prince George RV park.

In addition, while L.S. testified at trial that appellant sexually abused her at her grandmother's house, the jury became aware *during the trial* that L.S. had informed Ms. Scheid and Investigator Gilliam at the time of the interview that she was never sexually abused at her grandmother's house. On cross-examination at trial, L.S. testified that appellant sexually abused her at her grandmother's house—which is not located in Dinwiddie County, as was clearly established during L.S.'s cross-examination. During Ms. Scheid's cross-examination, however, Ms. Scheid testified:

Q: Did you ask her if this man here touched her *anywhere other than Dinwiddie?*

A: Yes.

Q: You did?

A: Yes.

Q: Her answer was?

A: *Only in Dinwiddie.*

(Emphasis added). Although Ms. Scheid's recollection of this portion of the interview with L.S. was not fully accurate at the time of trial,[24] this testimony conveyed the essentials of what L.S. indicated during the audiotaped interview—that appellant *did not* sexually abuse her at L.S.'s grandmother's home, which is located outside of Dinwiddie County.

---

**24.** The audiotape of the interview reflects that L.S. said that appellant did not sexually abuse her at her grandmother's house, not that appellant did not sexually abuse her outside of Dinwiddie County.

Therefore, Ms. Scheid's testimony that is excerpted above: (a) categorically *excluded* L.S.'s grandmother's home from being a place where L.S. asserted during the interview that appellant sexually abused her; and (b) categorically *included* L.S.'s grandmother's home as a place where L.S. indicated during the interview that appellant *did not* sexually abuse her. The defense learned of this information in time to call into question the credibility of L.S.'s trial testimony that appellant sexually abused her at her grandmother's house. Appellant cannot now establish the required prejudice under *Brady* simply because his defense counsel did not use this known inconsistency for impeachment purposes during the trial, even though, as just noted, his defense counsel knew about it.

The jury was also aware that L.S. testified at trial that the sexual abuse occurred *more* than ten times—based on a fair reading of the trial transcript, perhaps a lot more than ten times—and that L.S.'s testimony, therefore, contradicted her earlier statement during the interview with Ms. Scheid and Investigator Gilliam that appellant sexually abused her between five and ten times. Appellant's trial attorney actually highlighted this discrepancy for the jury during his closing argument, asserting that "we have had answers all over the map as to how many times it happened." Thus, the jury heard substantial impeachment evidence and argument concerning the consistency of the details of L.S.'s assertions of sexual abuse.

### B. *Appellant Presents the Same Type of Impeachment Evidence that Was Already Presented at Trial*

On appeal, the impeachment evidence that appellant presents in his *Brady* claim is really just the same type of impeachment evidence that the jury already considered at trial, when the jury could compare L.S.'s statements reflected in Investigator Gilliam's summary of the interview with L.S.'s testimony at trial. *See Lockhart v. Commonwealth*, 34 Va. App. 329, 346, 542 S.E.2d 1, 9 (2001) (noting that Lockhart's *Brady* evidence "was simply more of the same type of evidence and would not, we conclude, have put the whole case in

such a different light as to undermine confidence in the verdict"); *see also Byrd v. Collins,* 209 F.3d 486, 518 (6th Cir.2000) (" '[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.' " (quoting *United States v. Avellino,* 136 F.3d 249, 257 (2d Cir.1998))); *United States v. Cuffie,* 80 F.3d 514, 518 (D.C.Cir.1996) (explaining that "undisclosed impeachment evidence can be immaterial because of its cumulative nature only if the witness was already impeached at trial by the same kind of evidence").

In this case, some of the *details* of L.S.'s inconsistencies cited by the majority opinion are now different, in light of the specific statements from L.S. that are reflected on the audiotape, but they concern the *same types of inconsistencies* from L.S. that the jury already considered—i.e., where the sexual abuse occurred and how many times the sexual abuse occurred. However, even this assessment of appellant's *Brady* claim overstates the strength of his argument on appeal. This is because the audiotape and the investigator's summary reflect *no* differences in the number of times that L.S. asserted she had been sexually abused during the interview.[25] Appel-

---

**25.** On brief, appellant refers to other "areas of interest" of L.S.'s trial testimony that, he claims, could have been the subject of impeachment if the audiotape had been disclosed by the time of trial. While the analysis of a *Brady* claim must reflect "the cumulative effect" of all asserted *Brady* evidence, *Kyles,* 514 U.S. at 459, 115 S.Ct. at 1578, these additional subjects presented in appellant's brief present essentially no new impeachment value. As to whether the alleged sexual abuse of L.S. occurred only in appellant's bedroom or in his bedroom and also in L.S.'s bedroom, the audiotape of L.S.'s interview and Investigator Gilliam's written summary of the interview both contain the same information. As to whether L.S.'s mother was present in the bedroom when the alleged sexual abuse occurred, nothing that L.S. stated during the audiotaped interview was in tension with her trial testimony that her mother was not present during the sexual abuse. As to L.S.'s testimony at trial that appellant told L.S. to fondle her younger brother (on her mother's side of the family) in the bathtub, neither the audiotape of the interview nor the investigator's written summary of the

lant's trial attorney actually used the information in the investigator's summary to impeach L.S. on this subject just as effectively as he could have used the audiotape. Consequently, what appellant's *Brady* claim *actually* boils down to is L.S.'s inconsistency concerning where, *in addition* to the white house, the sexual abuse occurred. However, as noted above, the jury was already aware that L.S. had been inconsistent on this very same subject of where the sexual abuse occurred.

### C. *The Decision in Smith v. Cain is Distinguishable*

According to the majority opinion in this case, the United States Supreme Court's recent decision in *Smith v. Cain,* —— U.S. ——, 132 S.Ct. 627, 181 L.Ed.2d 571 (2012), is controlling on the facts of this case. I respectfully disagree. In my view, the circumstances in *Smith* were very different than the circumstances are here. *See Lockhart,* 34 Va.App. at 346, 542 S.E.2d at 9 ("The materiality inquiry is a context-specific determination; evidence that is material in one setting could be immaterial in another."). The circumstances that rendered the undisclosed impeachment evidence material in *Smith* do not somehow make appellant's asserted *Brady* evidence material in this case.

In *Smith,* the issue was the eyewitness' identification of Smith as one of three gunmen who committed murder during a home invasion and armed robbery. At trial, the prosecution's star eyewitness (Boatner) testified that Smith was the first gunman to come through the door and that he had been face-to-face with Smith during the robbery. Boatner testified

---

interview contains this assertion. Thus, the defense could have impeached L.S.'s testimony on that subject just as effectively using the written summary of the interview as it could have using the audiotape of the interview. Furthermore, it should be noted that L.S. actually referred to this specific incident well before trial—indeed, before her interview with Ms. Scheid and Investigator Gilliam—when L.S. told her father about this incident after she fondled her younger nephew (on her father's side of the family). Therefore, the jury was certainly aware that L.S.'s assertion that appellant directed her to fondle her younger brother in the bathtub was not an assertion made for the first time at trial.

that he had "[n]o doubt" that Smith was the gunman with whom he had stood face-to-face on the night of the crime. However, the prosecution had failed to disclose to the defense statements that Boatner made on the night of the crime and five days after the crime indicating that Boatner could not identify any of the gunmen. *Smith,* —— U.S. at ——, 132 S.Ct. at 629–30.

On appeal from the lower courts' refusal to grant Smith post-conviction relief under *Brady,* the United States Supreme Court held that "Boatner's undisclosed statements were plainly material," explaining:

> We have observed that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict. *See United States v. Agurs,* 427 U.S. 97, 112–113, 96 S.Ct. 2392 [2402] 49 L.Ed.2d 342, and n. 21 (1976). That is not the case here. Boatner's testimony was the *only* evidence linking Smith to the crime. And Boatner's undisclosed statements directly contradict his testimony: Boatner told the jury that he had "[n]o doubt" that Smith was the gunman he stood "face to face" with on the night of the crime, but Ronquillo's notes show Boatner saying that he "could not ID anyone because [he] couldn't see faces" and "would not know them if [he] saw them." App. 196, 200, 308. Boatner's undisclosed statements were plainly material.

*Smith,* —— U.S. at ——, 132 S.Ct. at 630 (emphasis in original).

In context, the Supreme Court's statement that "Boatner's testimony was the *only* evidence linking Smith to the crime" means that Boatner was the only witness at Smith's trial who could *identify* Smith as one of the gunmen present on the night of the crime.[26] The jury believed Boatner's testimony

---

**26.** I disagree with the majority's assertion that L.S.'s testimony is "the only evidence linking" appellant to the crimes here. L.S.'s father testified at trial that L.S. told him that appellant "had abused her" by "sticking his fingers inside of her." Moreover, L.S.'s stepmother testified that L.S. told her that she "had been sexually abused" and that

that Smith was one of the gunmen and convicted him. However, if the jury had been presented evidence that Boatner was unable to identify any of the gunmen, including Smith, at the time of the crime, then the jury could well have disbelieved Boatner's testimony that Smith was one of the gunmen. The inconsistencies between Boatner's trial testimony and his earlier statements implicated the very basic, highly material question of whether Smith *was even there* when the crimes were committed. Because the question of Smith's presence at the crime scene suddenly appeared in a new and different light, Smith's asserted *Brady* evidence " 'undermine[d] confidence in the outcome of the trial.' " *Id.* (quoting *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566).

Aside from its recitation of general *Brady* principles, the decision in *Smith* has essentially no application to the context of the record of this particular case. There was no question at appellant's trial that L.S. could accurately identify appellant—and the audiotape of L.S.'s interview certainly contains nothing new on this subject.

The Supreme Court of Virginia's opinion in *Bly v. Commonwealth*, 280 Va. 656, 702 S.E.2d 120 (2010), also provides a useful contrast with the facts of this case. To prove Bly's

---

"[appellant] had been placing his fingers on her private parts and that had been going on for some time." These statements from L.S. were not made during the recorded interview—and, in fact, predated that interview. Furthermore, Ms. Amy Holloman, L.S.'s counselor who spent many hours with L.S., has concluded that L.S. was sexually abused, given the symptoms and behavior manifested by this child and Ms. Holloman's extensive experience in evaluating such children. No objection was made against any of this testimony, and there is no indication from the record that this testimony was admitted for any purpose other than the truth of the matter asserted. While all of this evidence, of course, originated from L.S.'s own statements and behavior, the very nature of sexual assault and sexual abuse cases is that there are no eyewitnesses to the sexual abuse other than the perpetrator and the victim. That is why the testimony of the victim in such cases is enough to obtain a conviction. *See, e.g., Fisher v. Commonwealth*, 228 Va. 296, 299, 321 S.E.2d 202, 204 (1984) (noting that "the victim's testimony, if credible and accepted by the finder of fact, is sufficient evidence, standing alone, to support the conviction" in a rape or sexual abuse case).

guilt, the Commonwealth relied on a confidential informant's testimony attesting that he had participated in two alleged controlled drug transactions with Bly—but the Commonwealth did not disclose to the defense that the police were aware that the confidential informant had been providing false accounts of controlled transactions, was *only* paid by the authorities if he reported a drug transaction, and had reported a total of eighty-three controlled buys during a seven-month period. *Id.* at 658–60, 702 S.E.2d at 121–22. The Supreme Court granted Bly a new trial under *Brady*, explaining:

> In the present case, in view of (1) the Commonwealth's failure to introduce the audio recordings Hoyle was equipped to make of his dealings with Bly, (2) the lack of any other evidence to corroborate Hoyle's testimony as to those transactions, and (3) Hoyle's obvious pecuniary incentive to fabricate drug "buys," the suppression of evidence that *could have led to a devastating impeachment* of Hoyle's credibility undermines confidence in the outcome of the trial.

*Id.* at 663, 702 S.E.2d at 124 (emphasis added). In *Bly*, therefore, the suppression of evidence that the confidential informant had a substantial motive to fabricate drug buys was material under *Brady* because the confidential informant's credibility could have been devastated if the jury had known this information.

What *Smith* and *Bly* (and other *Brady* decisions [27]) have in common is the suppression of *significant* evidence that affects

---

27. For example, in *Kyles*, the United States Supreme Court held that the suppressed *Brady* evidence significantly eroded the reliability of identifications of Kyles made by two key prosecution witnesses—and also called into question whether the informant in that case should have been considered a suspect. *Kyles*, 514 U.S. at 441–43, 445–47, 115 S.Ct. at 1569–72. Moreover, in *Workman*, the Supreme Court of Virginia held that, as to Workman's claim of self-defense, "Workman was deprived of introducing evidence of three recent incidents involving Bumbry firing weapons at others." *Workman*, 272 Va. at 650, 636 S.E.2d at 377. "Most certainly, such evidence has the potential to be *powerful impeachment* of Bumbry's statement at trial that he did not have a gun at the scene and his denial" that he carried firearms." *Id.*

the credibility of a prosecution witness to the degree that it truly impacts and undermines confidence in the verdict. In such cases, "the omitted evidence creates a reasonable doubt that did not otherwise exist" based on solely the evidence that was presented at trial. *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2402. This case is very different than those cases. The audiotape of L.S.'s interview did not contain any new information that would suggest that L.S. misidentified appellant, that someone other than appellant had sexually abused L.S., or that L.S. had not been sexually abused at all and had simply fabricated the allegation that she had been sexually abused. Instead, appellant's asserted *Brady* evidence only concerns certain inconsistencies in comparatively minor *details* associated with her allegation that appellant sexually abused her—i.e., where, *in addition to* the white house, the sexual abuse occurred. And the jury was already aware from the evidence and argument at trial that L.S. had been inconsistent in this regard.

Unlike in *Smith*, appellant's asserted *Brady* evidence "was of a no more significant nature than the impeachment evidence already presented at trial," *Lockhart*, 34 Va.App. at 346, 542 S.E.2d at 9—or that defense counsel could have *exploited* at trial, based on the evidence as it developed during the trial. Appellant's asserted *Brady* evidence is "simply more of the same type of evidence and would not . . . have put the whole case in such a different light as to undermine confidence in the verdict." *Id.*

### D. *Applying Appellant's Brady Claim to the Context of the Record Here*

Appellant's *Brady* claim essentially concerns the precise location or locations where L.S. asserted that appellant sexually abused her—not any misidentification of appellant on L.S.'s part, and not anything relating to a motive to fabricate the

---

at 650, 636 S.E.2d at 377–78 (emphasis added). Therefore, Workman's *Brady* claim implicated "evidence of Workman's reasonable apprehension for his safety and evidence of who was the aggressor in this altercation." *Id.* at 650, 636 S.E.2d at 378.

allegation on L.S.'s part, but simply the location or locations where appellant committed the sexual abuse against L.S.

Appellant's *Brady* claim does not detract in any way from L.S.'s consistent assertion that appellant sexually abused her at the white house in Dinwiddie County. Furthermore, L.S.'s inconsistency on the question of whether appellant sexually abused her at her grandmother's house outside of Dinwiddie County was learned by the defense at trial and could have been exploited by the defense at trial. Moreover, L.S.'s inconsistency concerning her accusation that appellant sexually abused her at the Prince George RV park was known by the defense at trial, based on both Investigator Gilliam's written summary of the prior interview with L.S. and Ms. Scheid's testimony at trial—and was exploited by the defense at trial.

Thus, distilled to its essence, what appellant's *Brady* claim really boils down to is an unresolved factual question of whether L.S. asserted that appellant sexually abused her one time at the Green Acres Trailer Park—stated apparently after the tape recorder stopped recording L.S.'s statement to Ms. Scheid and Investigator Gilliam.[28] In my view, this one ques-

---

28. In response to Investigator Gilliam's final question asking where the last incident of sexual abuse occurred, L.S. stated, "um the last time was last year after I saw last year um when I was seeing him um it wasn't when we were living in the trailer it was when I was like living with"—and then the tape recorder stopped recording the rest of her answer. According to Investigator Gilliam's summary of the interview, L.S. subsequently indicated that the last incident of sexual abuse occurred at the family friend's trailer home, which the investigator determined was in the Green Acres Trailer Park in Dinwiddie County. The audiotape reflects that L.S. stated earlier in the interview that appellant did not sexually abuse her at that trailer home. While it is true that L.S. is never actually heard saying at the conclusion of the interview that the last incident of sexual abuse occurred there, it should be noted that the Commonwealth's response to appellant's pre-trial motion for a bill of particulars indicated that appellant was alleged to have committed criminal acts at the Green Acres Trailer Park—in addition to the white house. Thus, the Commonwealth's bill of particulars response could be used to corroborate Ms. Scheid's and Investigator Gilliam's testimony that L.S. stated that she was sexually abused at the trailer park, as reflected by the investigator's written summary of the interview.

tion does not come close to undermining confidence in the outcome of appellant's trial, especially when the entire record is considered, as case law demands that we do.

I certainly disagree with the majority's broad assertion that my analysis in this dissenting opinion simply ignores the *Brady* materiality standard that the United States Supreme Court stated in *Kyles*. On the contrary, my analysis is actually grounded in the *Kyles* standard—i.e., that evidence becomes material under *Brady* only when it could "reasonably be taken to put *the whole case* in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. at 1566 (emphasis added). I emphasize the United States Supreme Court's use of the words "the whole case" because those words reflect the longstanding principle that a *Brady* claim must be "evaluated in the context of the entire record" of the case. *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2402. The majority opinion would appear to find any undisclosed statements that a seven-year-old witness makes in a child sexual abuse case that are even slightly inconsistent on the details of the alleged offense are enough to trigger the *Brady* materiality rule—and thus, require the reversal of the convictions. However, *Brady* and its progeny do not establish a *per se* rule that inconsistent statements concerning the details of alleged child sexual abuse "are by definition material" in such a situation under *Brady*, as the majority contends. As an appellate court, we are required to evaluate the inconsistent statements—at first individually,[29] and then consider them

---

**29.** While the majority opinion vaguely criticizes this dissenting opinion for "pars[ing] L.S.'s testimony item by item," I am simply following the United States Supreme Court's instructions for reviewing a *Brady* claim. As the Supreme Court explained in *Kyles*, an appellate court reviewing a *Brady* claim must "evaluate the tendency and force of the undisclosed evidence item by item; there is no other way." *Kyles*, 514 U.S. at 437 n. 10, 115 S.Ct. at 1578. The appellate court should then determine the "cumulative effect [of this evidence] for purposes of materiality separately" at the conclusion of the *Brady* analysis. *Id.* I have, therefore, evaluated each of appellant's contentions regarding L.S.'s pre-trial interview and trial testimony item by item (and have noted that several of appellant's contentions simply lack force for the purpose of a *Brady* analysis). Based on United States Supreme Court

collectively—and determine whether the asserted *Brady* evidence could "reasonably be taken to put *the whole case* in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. at 1566 (emphasis added). Accordingly, we must consider not *just* the inconsistent statements—but *also* the broader context of the record in this case.

Here, the Commonwealth also presented expert testimony from L.S.'s child therapist, who explained that it is uncommon for children who have been sexually abused "to remember specific dates and instances of sexual abuse" because "they try to repress that as much as possible" and that it is common "for more information to come out" after a young victim of sexual abuse begins therapy. L.S.'s therapist testified, in her expert opinion, that the behavior L.S. exhibited in front of her was consistent with the behavior of a child who had been sexually abused and that she did not believe that L.S. was lying to her. The majority notes that a jury need not accept an expert's opinion—which is, of course, true. However, viewing "the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party" in the trial court, *Riner v. Commonwealth*, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004), *this Court* must accept as a historical fact that L.S. fondled her younger nephew during a Super Bowl party in early 2008. Both L.S. and her nephew were naked from the waist down at the time. L.S. explained after the incident that she touched her nephew inappropriately because appellant had touched her in a similar manner.

The incident between the young L.S. and her nephew during the Super Bowl party provides an important layer of context to the analysis here. Evidence that L.S. acted out sexually in this way is evidence corroborating her contention that she had been sexually abused [30]—and the issue of whether

precedent, there is no other way of conducting a *Brady* materiality analysis to determine, in the end by considering the whole case, whether confidence in the verdict has been undermined.

**30.** Significantly, this incident with L.S.'s nephew was entirely consistent with Ms. Holloman's expert testimony reflecting her very common

she had been sexually abused *at all* was the issue of contention at appellant's trial. (Neither the evidence at trial *nor* the audiotape of the interview provides even the slightest suggestion that *someone else* had sexually abused L.S.) No new ground could have been developed on the issue of whether L.S. had actually been sexually abused—even if the defense had been given the audiotape of L.S.'s interview with Ms. Scheid and Investigator Gilliam before or during the trial.

Appellant simply was not prejudiced by the Commonwealth's earlier failure to disclose the audiotape to the defense. As the majority notes, it is appellant's burden to establish a reasonable probability that, if his claimed *Brady* evidence had been disclosed to the defense, the result of the proceeding would have been different. *See, e.g., Gagelonia v. Commonwealth,* 52 Va.App. 99, 112, 661 S.E.2d 502, 509 (2008). In short, appellant simply has not shown that confidence in the outcome of his trial has been undermined to a reasonable probability—as required by the *Brady* rule.

### E. *Materiality as to Punishment*

The majority also provides an alternative basis for reversal under *Brady* here. Even if appellant's asserted *Brady* evidence is not material as to guilt, the majority states that it is still material as to punishment. Certainly, as a general matter, reversal is required under *Brady* where the suppressed "evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1197; *see Cone v. Bell,* 556 U.S. 449, 451, 129 S.Ct. 1769, 1772, 173 L.Ed.2d 701 (2009).

Here, however, I see no indication in the record that appellant ever raised in the trial court a *Brady* claim *as to punishment.* Instead, appellant's arguments in the trial court centered solely on materiality *as to guilt* under *Brady.* On this basis, I would hold that any argument raised on appeal

---

sense observation that, as she indicated, young children who have been the victims of sexual abuse will then tend to "act[ ] out sexually" towards others.

that there was suppression of evidence that is material *as to punishment* is barred under Rule 5A:18. Furthermore, appellant has not requested that this Court apply an exception to Rule 5A:18, and this Court does not apply such an exception *sua sponte.*

In addition, having reviewed the record in this case, I do not believe that appellant has satisfied *Brady's* materiality standard even as to punishment. The only real basis in the record that I can detect for even arguing that appellant here was prejudiced as to punishment is to note that he was sentenced above the statutory minimum for his offenses. Certainly, however, the fact that an inconsistency by a witness was not disclosed to the defense in time to be used at trial cannot be considered material simply because the defendant did not receive the minimum possible punishment. Otherwise, any time there is a lack of disclosure and the minimum sentence is not given for each conviction, this would be a *per se* violation of *Brady.*

In my view, appellant has failed to establish a reasonable probability that his punishment would have been different if the audiotape of L.S.'s interview had been disclosed to the defense.

### III. CONCLUSION

Assuming without deciding that the Commonwealth should have listened to the tape recording of L.S.'s interview to determine if it had exculpatory material, the failure to do so, under these particular circumstances, does not establish the required materiality in the constitutional sense under *Brady.* There was not. much more or truly different impeachment evidence that could be brought forward to impeach this seven-year-old child that was not already available to the defense to provide to the factfinder, and the victim here was always consistent that appellant sexually abused her at the "white house." Appellant was not prejudiced in any material way under the standard set forth by the United States Supreme Court in *Brady* and by the opinions of the United States Supreme Court and the Supreme Court of Virginia interpret-

ing and applying *Brady.* Accordingly, since I believe appellant's "trial result[ed] in a verdict worthy of confidence," *Kyles,* 514 U.S. at 434, 115 S.Ct. at 1566, I would affirm the convictions in this case.