COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Athey, Friedman and Lorish
Argued at Salem, Virginia


JASON EMORY WHITTAKER

MEMORANDUM OPINION* BY
v.        Record No. 2089-24-3            JUDGE LISA M. LORISH
                                         OCTOBER 28, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SMYTH COUNTY
Deanis L. Simmons, Judge

Jimmie L. Hess, Jr. (Conway & Hess, P.L.L.C., on brief), for
appellant.

Timothy J. Huffstutter, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


After the murder of Teresa Greer, a jury convicted Jason Emory Whittaker of first-degree

murder, arson of an occupied dwelling, abduction, and animal cruelty. Whittaker appeals all of

his convictions. He argues his DNA evidence was wrongfully obtained, the Commonwealth's

hearsay evidence was erroneously admitted, the defense's motion for mistrial based on a *Brady*

*v. Maryland*, 373 U.S. 83 (1963), violation was incorrectly denied, and the Commonwealth's

evidence was insufficient to support any of his convictions. For the reasons detailed below, we

affirm his convictions.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

*The Murder of Greer*

This case arises from the murder of Teresa Greer. Greer was staying with her friend, Lisa Atwell. The women lived in the bottom unit of Atwell's two-story residence in Marion, and Atwell leased the separate second-story apartment. The bottom unit was only accessible through the back door because Atwell kept the front door sealed off for her dogs, who were living outside on the patio. Greer's own dog resided inside the house with the two women.

On March 16, 2021, Whittaker, whom Atwell knew from the neighborhood, came to her house to ask if she needed help with anything. Atwell politely declined the offer, but Whittaker insisted that he come by the next day to chop a pile of wood in Atwell's yard. The next morning, Whittaker chopped the wood, stepped inside Atwell's kitchen to wash his hands, and then left. Greer was not home at the time.

Late into the next night, around 1:15 a.m. on March 18, Atwell left the house to drive a friend to the bus station, leaving Greer at home alone with the dogs. Greer then invited the next-door neighbor, Reva Presley, over for a beer. Presley arrived at about 1:30 a.m.

Around 2:00 a.m., Whittaker knocked on Atwell's door, and Greer let him in. Whittaker wore only a pair of shorts and a trash bag in lieu of a shirt, and he had a clothes hanger stuck in his foot. Inside, he asked the women for a beer. The women declined and tried unsuccessfully to convince him to leave. Meanwhile, Greer texted Atwell, "[T]hat crazy guy [is] here . . . I can[']t get him to leave." Atwell then called Greer, and Greer explained that the "guy that was chopping wood" was at the house. Atwell asked, "Jason? Now? Why?" Greer did not respond

---

[1] On appeal, this Court views the evidence and all reasonable inferences flowing from it in the light most favorable to the Commonwealth, the party that prevailed in the trial court. *See Goodwin v. Commonwealth*, 71 Va. App. 125, 129 n.1 (2019).

directly but stated that he had "something wrong with his foot" and "was needing help." Atwell heard Whittaker's voice in the background.

Presley went to her house to retrieve clothes for Whittaker. She returned with a pair of khaki pants and a black sweatshirt, which Whittaker put on. Presley again tried to kick Whittaker out, but he pushed her out of the house and locked the door. She then returned to her home and retrieved her son and cousin to help her. The cousin tried to kick the door in while Presley called 911. When the dispatcher asked Presley if she knew the man, Presley responded, "Whittaker." The police arrived but, after knocking and hearing no noises inside, left shortly thereafter.

About ten minutes after the police left, Presley saw flames and smoke coming from the house and again called 911. The police returned, this time with the fire department. Atwell arrived back home around the same time and saw her house in flames. She told officers that Greer and Whittaker were inside her home.

Firefighters entered the house and discovered the bodies of Greer and her dog, but not Whittaker. The bodies were in the bathroom, partially protected from the fire by sheetrock that had fallen on top of them. As firefighters removed Greer's body, they discovered a pair of suspenders wrapped around her neck and a doorknocker in her hand. The suspenders were tied to a belt that was wrapped around the bathtub's shower curtain rod. The area beneath Greer's body was relatively clean, indicating that she likely died before the fire. The firefighters then left the bodies and told the police that they needed a search warrant to proceed. It was not until after 6:00 a.m. that the fire department controlled the fire and secured the scene.

The autopsy determined Greer's cause of death to be homicide by blunt and sharp force injuries of the head as well as strangulation. Once she was allowed to enter her house, Atwell noticed a claw hammer that was out of place and brought it to investigators. The examiner noted

- 3 -

blunt force injuries on Greer's face that were consistent with something like a claw hammer. An autopsy also showed a ligature pattern and strangulation injuries on her neck. The lack of soot in Greer's lungs confirmed that she had died before the fire. The dog, however, had soot in her lungs, indicating she died from smoke inhalation.

Later investigation revealed that the fire started in the first-floor living room. An arson investigator testified that the fire was particularly intense around one window, indicating that the window was broken or open and feeding oxygen into the house. Moreover, the window had very little soot on it, suggesting that the room was not smoky before the window broke. Investigators concluded that this evidence indicated Whittaker likely escaped through the window and fled the scene before officers arrived.

*Whittaker's Movements after the Murder*

Meanwhile, around 8:00 a.m. on March 18, Whittaker's old schoolmate Christopher Hall awoke to find Whittaker sleeping in his living room. Hall's house was located less than a mile from Atwell's. Hall described Whittaker's sleeping over as not "customary" but not "too surprising." He remembered that Whittaker wore khaki pants with mud stains. Hall agreed to drive Whittaker to meet up with Whittaker's ex-wife, Michelle Barr, in Sugar Grove. Hall drove him to a Dollar General, where Barr was waiting with her then-boyfriend, Derek Blevins. Blevins noticed that Whittaker wore khakis and a hoodie and that he "smelled like smoke." The couple then drove Whittaker to the home of Barr's father in Konnarock. Whittaker spent the next two nights in a vacant outbuilding in Konnarock.

Two days later, on March 20, a friend of Barr's gave Whittaker a ride from Konnarock to Whitetop to again meet with Barr and Blevins. Barr and Blevins picked him up from Whitetop and drove him to Surry County, North Carolina. At some point, Whittaker made a statement to Blevins about hitting someone in the head with a hammer. Once in North Carolina, Blevins and

Whittaker got into an argument, which led to Whittaker's arrest on charges unrelated to Greer's murder.

On March 24, four days after the arrest, Marion investigators drove to North Carolina to meet with Whittaker in the Surry County jail. Whittaker initially refused to meet with them, so officers conferred with a Surry County investigator to obtain a search warrant from a North Carolina judge, which allowed them to collect evidence from Whittaker. The Marion officers then took photos of Whittaker and collected a buccal swab and fingernail clippings. They took the evidence back to Virginia for lab analysis. The DNA taken from Whittaker matched the male DNA found under Greer's fingernails.

Several days later, police went to Konnarock to investigate the abandoned outbuilding where Whittaker had stayed. They found the door ajar with pry marks on it. Inside, they found khaki pants and a hoodie resembling the clothes Whittaker borrowed from Presley. The officers obtained a search warrant, collected the clothing items, and sent them for DNA testing. The forensic lab determined that DNA from the inside of the pants matched Whittaker's, and DNA from the blood stains on the pants matched Greer's.

*Whittaker Proceeds to Trial*

Whittaker was indicted for first-degree murder, arson of an occupied dwelling, abduction, and animal cruelty, and he elected to be tried by jury. The witnesses testified to the facts as summarized above. On the final day of trial, Whittaker moved for a mistrial based on an alleged *Brady* violation. He accused the Commonwealth of withholding the fact that a Marion officer— not a North Carolina officer—executed the Surry County search warrant and obtained Whittaker's DNA. Once Whittaker learned this, he moved to suppress the evidence obtained at the jail, arguing that Virginia law enforcement could not execute a warrant obtained by a North

Carolina investigator and signed by a North Carolina judge. The trial judge denied the motion to suppress and later denied the motion for a mistrial.

A jury in the Circuit Court of Smyth County convicted Whittaker of first-degree murder, arson of an occupied dwelling, abduction, and animal cruelty. On July 29, 2024, Whittaker moved to set aside the verdict and grant a new trial. Whittaker argued that (i) the court erred in admitting hearsay testimony, (ii) the court should have declared a mistrial after the discovery of the alleged *Brady* violation, and (iii) the evidence failed to prove that Whittaker was present at the time of the murder. The court denied the motion.

The court sentenced Whittaker to life in prison for murder, 75 years for arson, 10 years for abduction, and 5 years for animal cruelty. Whittaker appeals.

ANALYSIS

Whittaker argues on appeal that his Fourth Amendment rights were violated when Virginia law enforcement officers executed a North Carolina search warrant in North Carolina.[2] Relatedly, he asserts that the Commonwealth committed a *Brady* violation by failing to timely disclose that Virginia officers executed the warrant. At oral argument, Whittaker conceded that if his argument for suppression failed, then his argument that the failure to provide this information was a *Brady* violation necessarily failed as well. We therefore take up the suppression question first. Then, we turn to Whittaker's arguments that the trial court erred by admitting hearsay testimony from Officer Sexton and by finding the evidence sufficient to sustain each of his convictions.

---

[2] While Whittaker's assignment of error also argues that his rights under the Sixth Amendment of the United States Constitution were violated, at oral argument he agreed he had not briefed this question. Thus, this argument is waived. *See* Rule 5A:20(c).

I.  The trial court did not err by denying the motion to suppress.

We review de novo "a trial court's denial of a defendant's motion . . . when the defendant claims that the evidence sought to be suppressed was seized in violation of the Fourth Amendment."  *Vaughan v. Commonwealth*, 53 Va. App. 435, 437 (2009) (quoting *Glenn v. Commonwealth*, 275 Va. 123, 130 (2008)).  The constitutionality of a search under the Fourth Amendment "involve[s] questions of both law and fact."  *Lawson v. Commonwealth*, 55 Va. App. 549, 554 (2010) (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 197 (1997) (en banc)).  We are "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers."  *Cantrell v. Commonwealth*, 65 Va. App. 53, 56 (2015) (quoting *McGee*, 25 Va. App. at 198).  Ultimately, we "independently decide whether, under the applicable law, the manner in which the challenged evidence was obtained satisfies constitutional requirements."  *Jackson v. Commonwealth*, 267 Va. 666, 672 (2004).

Whittaker argues that the admission of his DNA violated the Fourth Amendment because law enforcement officers from Virginia lacked authority to execute a North Carolina warrant.[3] For support, Whittaker looks to North Carolina General Statute § 15A-247, which states that a "search warrant may be executed by any law-enforcement officer acting within his territorial jurisdiction, whose investigative authority encompasses the crime or crimes involved."  Whittaker also argues that Virginia Code § 19.2-56 "clearly spells out who may execute a search warrant" and does not "list law enforcement officers of another state."  Whittaker therefore

---

[3] The Commonwealth argues that Whittaker failed to sufficiently preserve this issue for appeal.  We assume without deciding that Whittaker's objection at trial was sufficient and that addressing the question on the merits is the "best and narrowest ground" for resolution.  *Durham v. Commonwealth*, 303 Va. 310, 322 n.2 (2024).

contends that the Virginia officers acted outside the scope of their statutory authority and circumvented the proper warrant process.

At best, Whittaker presents arguments that the Virginia law enforcement officers violated state statutes. But as Whittaker correctly acknowledged at oral argument, neither statute to which he points contains a suppression remedy. And "our Supreme Court has steadfastly refused to extend" the exclusionary rule "to encompass evidence seized pursuant to statutory violations, absent an express statutory provision for suppression." *Weaver v. Commonwealth*, 29 Va. App. 487, 492 (1999) (quoting *Janis v. Commonwealth*, 22 Va. App. 646, 651 (1996)). What is more, Whittaker has not provided any argument for why the execution of a search warrant in another state violates the Fourth Amendment. Nor can we find any support for this argument. In fact, "linking Fourth Amendment protections to state law would" be problematic because it would "cause them to 'vary from place to place and from time to time.'" *Virginia v. Moore*, 553 U.S. 164, 176 (2008) (quoting *Whren v. United States*, 517 U.S. 806, 815 (1996)).

The only argument Whittaker raises on appeal is that the officers violated state law in executing the warrant. He has not argued that the officers acted unreasonably, or that the warrant was not based on probable cause. Finding no violation, we affirm the trial court's ruling that suppression of the evidence was not required. And because there was no constitutional violation, there could be no *Brady* violation in failing to disclose the identity of officers who executed the warrant in a timelier manner. "A *Brady* violation occurs when the prosecution suppresses evidence favorable to the defendant that is material either to guilt or to punishment." *Tuma v. Commonwealth*, 60 Va. App. 273, 299 (2012) (en banc) (emphasis omitted). Assuming without deciding that the prosecution suppressed this evidence, Whittaker has not shown that it was material.

- 8 -

II. The trial court did not err in admitting Officer Sexton's testimony.

Whittaker next argues that the trial court abused its discretion by failing to exclude Officer Sexton's testimony because it was hearsay. Determining the "'admissibility of evidence is within the discretion of the trial court,' and an appellate court will not reject such decision absent an 'abuse of discretion.'" *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020) (quoting *Tirado v. Commonwealth*, 296 Va. 15, 26 (2018)). "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Bista v. Commonwealth*, 303 Va. 354, 370 (2024) (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)).

At Whittaker's trial, Detective Sexton of the Marion Police Department testified that a witness advised police that Whittaker had spent the night at a residence in Konnarock. Whittaker lodged several objections to this testimony as hearsay, but the court overruled each one. The trial court found that the testimony was not offered for the truth of the matter asserted because it described "only as to how and why [Sexton] got there and what he found when he got there." The court added, "[I]nvestigators go from one witness to another and that's how they accumulate the information that they get . . . this is simply tracing the steps of the investigation." The court also gave a limiting instruction about the testimony—agreed to by Whittaker—telling the jury that Sexton's testimony "was not offered for the truth of the statement that the individual gave, but to simply let you understand why the officer took the actions that he took as part of the investigation."

Assuming without deciding that Whittaker's agreement to the limiting instruction did not waive this argument on appeal, we cannot say the trial court's ruling was an abuse of discretion. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Va. R. Evid. 2:801(c). "If a statement is offered for any purpose other than to prove the truth or falsity of the contents of the statement, such as to explain the declarant's conduct or that of the person to whom it was made, it is not objectionable as hearsay." *Jones v. Commonwealth*, 71 Va. App. 597, 604 (2020). The evidence here was not hearsay because it was offered not to show that Whittaker actually spent the night in Konnarock but to explain why Officer Sexton went to Konnarock to investigate.

For these reasons, we affirm the trial court's decision to admit the testimony to explain Officer Sexton's actions.

III. The trial court did not err in concluding that the evidence was sufficient to support each of Whittaker's convictions.

Finally, Whittaker argues that the evidence presented at trial was insufficient to support his convictions. When reviewing the sufficiency of the evidence, "[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it." *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "Viewing the record through this evidentiary prism requires [the appellate court] to 'discard the evidence of the

accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Bowman v. Commonwealth*, 290 Va. 492, 494 (2015) (quoting *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015)).

Whittaker asserts that "the only evidence that definitively put [him] at the scene of the crime on March 18, 2021, is Reva Presley['s testimony]." Whittaker points out that "Presley is an admitted alcoholic with memory issues," she "was unable to identify the Appellant at the trial," and she "admitted to drinking a lot" during the 24-hour period leading up to the murder. According to Whittaker, the only other evidence "came from Officer Sexton who relied on hearsay testimony." Whittaker only argues there was insufficient evidence to prove he was the one who committed the crimes and does not argue that there was a lack of evidence to prove any of the other elements of the counts of conviction.

Turning to Presley's testimony, the jury could assess her credibility as a witness. While she testified that she was an alcoholic and had been drinking in the hours before the murder, the jury also heard Presley's identification of Whittaker in the 911 calls. In those calls, Presley clearly identified Whittaker as the man responsible for locking Greer in the house. And Atwell testified that Greer texted her "[t]hat crazy guy" was at the house, and Atwell heard Whittaker's voice on the phone when Greer called her. Presley's testimony is even stronger because Blevins noticed Whittaker smelled like smoke in the morning hours after the murder and fire and that Whittaker spent the night less than a mile away from Atwell's home. An appellate court "will not seek to pass upon the credibility of the witnesses where their evidence is not inherently incredible." *Gerald v. Commonwealth*, 295 Va. 469, 486 (2018) (quoting *Rogers v. Commonwealth*, 183 Va. 190, 201-02 (1944)). Because we do not find Presley's testimony to be inherently incredible, we defer to the jury's judgment of her credibility.

Moreover, even if we were to put aside Presley's testimony, there are sufficient facts to support the verdicts. To start, Whittaker ignores the DNA evidence. Specifically, he ignores that Greer's DNA was found on his blood-stained pants and that Whittaker's DNA matched the biological material found under Greer's fingernails. Additionally, Blevins testified that Whittaker made a statement about hitting someone in the head with a hammer, and Atwell testified that the hammer in her home was out of place. The autopsy examiner also opined that Greer's injuries were consistent with a hammer. The DNA evidence plus the testimony from Blevins would be sufficient alone to sustain the verdicts here.

Considering these circumstances, a reasonable fact finder could conclude beyond a reasonable doubt that Whittaker was the person who abducted and murdered Greer, then set fire to Atwell's home, and cruelly treated Greer's dog who died from smoke inhalation.

CONCLUSION

For these reasons, we affirm the rulings of the trial court.

*Affirmed.*